**UEBERSEE FINANZ–KORPORATION AKTIEN GESELLSCHAFT v. ROSEN et al. ***

**No. 207.**

Circuit Court of Appeals, Second Circuit.
April 6, 1936.

Isidor J. Kresel, of New York City (John W. Davis, Isidor J. Kresel, and Bernard Hershkopf, all of New York City, of counsel), for complainant-appellant.

Van Vorst, Siegel & Smith, of New York City (Arthur B. Brenner, of New York City, of counsel), for defendant-appellee Ladenburg, Thalmann & Co.

Walter S. Logan, of New York City, for defendant-appellee Federal Reserve Bank of New York.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The complainant is a Swiss corporation having no place of business in the United States. On February 27, 1933, it acquired for use in its affairs gold coins of the United States of the face value of $1,250,000, and known as double eagles. On March 2, 1933, it caused these double eagles to be delivered to the defendant Ladenburg, Thalmann & Co. for storage, and the latter, when it received the gold, agreed to return it to the complainant on demand. On March 9, 1933, Congress passed an "Act To provide relief in the existing national emergency in banking, and for other purposes." 48 Stat. 1. In May, 1933, the complainant desired to transfer the gold to its own domicile in Switzerland, and caused Ladenburg, Thalmann & Co. to apply for a license from the Secretary of the Treasury to export the coins and to that end to have them placed to the credit of the Central Bank of Switzerland. The effect of exportation would have been to enable the complainant to realize upon the gold in its own country a value in excess of $2,100,000.

On July 6, 1933, the Acting Secretary of the Treasury, in reply to the application by Ladenburg, Thalmann & Co. for the export license, stated that, in the opinion of the Attorney General, the Executive Order of April 5, 1933, No. 6102, 12 U.S.C.A. § 248 note, forbidding the hoarding

of gold, did not apply to persons who had not subjected themselves to the jurisdiction of the United States, but added that the Executive Order of April 20, 1933, No. 6111, 12 U.S.C.A. § 95 note, prohibited the export of gold by any person except in certain specific cases enumerated in that order.

Thereafter, on April 18, 1934, the complainant, through its president, executed in Switzerland an application to the Secretary of the Treasury "in accordance with the Gold Reserve Act of 1934 and Section 34 of the Regulations issued thereunder" (48 Stat. 337) for a license to have the gold coins transferred to the Federal Reserve Bank of New York, to be held in custody for Banque Nationale Suisse, the central bank of Switzerland. This application was filed with the Treasury Department on May 9, 1934, by Ladenburg, Thalmann & Co., pursuant to instructions of complainant. On May 8, 1935, Ladenburg, Thalmann & Co. received a letter from Acting Secretary of the Treasury T. J. Coolidge, stating that the application to have the gold coins transferred to the Federal Reserve Bank of New York to be held in custody for the Banque Nationale Suisse had been denied, that the applicant had been directed to deliver such gold to the Federal Reserve Bank of New York for the account of the Treasurer of the United States against payment, and that, if such gold was then in the possession of Ladenburg, Thalmann & Co., or under their control, they were directed to deliver it forthwith to the Federal Reserve Bank of New York for the account of the Treasurer of the United States.

From time to time subsequent to May 4, 1935, and as a result of discussions between counsel for complainant and representatives of the Treasury, the Department indicated that it would temporarily refrain from taking action, in respect of its demand, for certain limited periods which were successively extended until June 15, 1935. On June 14, 1935, the attorneys for the complainant, anticipating the termination of further forbearance, demanded that Ladenburg, Thalmann & Co. deliver to Mr. Kresel, the complainant's solicitor, the gold coins in its possession. This demand was refused, and Ladenburg, Thalmann & Co. commenced to have the gold loaded into a truck for delivery to the defendant bank and transfer by it to the Treasurer of the United States. To prevent such a delivery, the complainant brought this suit, in which it prayed that Ladenburg, Thalmann & Co. or the Federal Reserve Bank, if the latter had received the gold, be directed to turn it over to the complainant or its designee, and that in the meantime the defendants be enjoined pendente lite from turning over the gold to any person other than complainant. A restraining order issued in connection with the motion for the preliminary injunction alone prevented the final delivery of the coins to the Treasurer of the United States.

A preliminary injunction was denied by the District Court, and a motion by the Federal Reserve Bank of New York to dismiss the bill as to it was granted on the ground that the complaint stated no cause of action against the bank. The complainant has appealed from the order denying a preliminary injunction and from the decree dismissing the bill as against the bank. We feel no doubt that each ruling was correct.

There can be no doubt that the dismissal of the bill as against the bank was proper, for the complaint contained no allegation that the bank was in possession of the gold, and, if the suit should prevail against Ladenburg, Thalmann & Co., the bank would never gain possession.

The main question is whether, upon the foregoing facts, a preliminary injunction ought to have been granted.

The complainant-appellant contends that:

(1) A right is shown to equitable relief.

(2) The United States was not an indispensable party to the suit.

(3) Neither the Act of March 9, 1933, nor any regulation validly made thereunder affected the complainant's right to hold or export the gold.

(4) The Gold Reserve Act of 1934 should not be given a retrospective effect.

(5) If the Gold Reserve Act of 1934 be applicable to the gold coins, the relevant provisions are unconstitutional, because (a) they involve an improper delegation of legislative power; and (b) they take the complainant's property without due process of law; (c) they cannot be so severed from the rest of the act as to leave any prohibition, that is applicable to the gold coins, lawfully effective.

■ While the existence of an equitable remedy is not free from doubt, yet, if the complainant is entitled as a matter of substantive law to obtain the gold for export, an equitable remedy would seem necessary to protect its rights. An action of replevin would not suffice. Though the complainant by posting a replevin bond could obtain possession of the gold, Ladenburg, Thalmann & Co., by giving a counter bond, could get it back and would thus be in a position to turn it over to the Treasury. In that event the recovery of the complainant upon the bond would be the value of the gold in the United States and not in Switzerland. This consideration renders the subject of litigation so unique and the right to recover damages so inadequate a remedy that a court of equity would properly assume jurisdiction, if the complainant had any right to export its gold.

■ The contention that the United States is an indispensable party may readily be disposed of. This suit cannot determine its rights. No one suggests that it has a present title to the gold, and, if the complainant should prevail, the government would not be bound by the decree, but could still assert in a direct suit against Ladenburg, Thalmann & Co., their transferees, or against the gold itself, any right it may have to acquire possession of the res. If the defendants' contention be sound, every suit against a person for acting under an alleged illegal order of the government would have to be dismissed because the latter was an indispensable party and yet, on account of its sovereign immunity, could not be brought in. Such is not the law. United States v. Lee, 106 U.S. 196, 1 S. Ct. 240, 27 L.Ed. 171; Lane v. Watts, 234 U.S. 525, 34 S.Ct. 965, 58 L.Ed. 1440.

■ We are told that the presence of the United States is requisite because, unless its rights are adjudicated, the defendants will be "subject to a penalty equal to twice the value of the gold" under section 3 of the Emergency Banking Act of 1933 (12 U.S.C.A. § 248(n), or section 4 of the Gold Revenue Act of 1934 (31 U.S.C.A. § 443), if they fail to comply with requisitions of the Secretary of the Treasury, even though they were bound to deliver the gold to complainant's designee pursuant to a decree in the present suit. But this seems to us an exaggerated view of the situation and quite a false alarm. If the requisition is invalid, there could, of course, be no danger to one who disregarded it. If, on the other hand, it is valid, nevertheless it is quite incredible that a penalty would or could be enforced against persons who had acted in good faith and done no more than to have their rights adjudicated in a lawsuit. If the peril of enormous penalties be as great as defendants suggest, they could doubtless have their rights against the government determined in a suit to restrain any public officer who might threaten enforcement. Ex parte Young, 209 U.S. 123, 145, 28 S.Ct. 441, 52 L.Ed. 714, 13 L.R.A.(N.S.) 932, 14 Ann.Cas. 764; Packard v. Banton, 264 U.S. 140, 44 S.Ct. 257, 68 L.Ed. 596; Tyson & Bro. United Theatre Ticket Offices v. Banton, 273 U.S. 418, 428, 47 S.Ct. 426, 71 L.Ed. 718, 58 A.L.R. 1236; Philadelphia Co. v. Stimson, 223 U.S. 605, 619, 32 S.Ct. 340, 56 L.Ed. 570. Though defendants should not prevail in such a suit, proceedings instituted in good faith to test rights have never, to our knowledge, been followed by the imposition of penalties, fines, or imprisonment.

*Emergency Act of March 9, 1933.*

■ Section 2, of this Act (12 U.S.C.A. § 95a) gave the President power to "investigate, regulate, or prohibit, under such rules and regulations as he may prescribe, by means of licenses or otherwise, any transactions in foreign exchange, transfers of credit between or payments by banking institutions as defined by the President, and export, hoarding, melting, or earmarking of gold or silver coin or bullion or currency, by any person within the United States or any place subject to the jurisdiction thereof."

Section 3 of the same act (12 U.S.C.A. § 248(n) provided: "Whenever in the judgment of the Secretary of the Treasury such action is necessary to protect the currency system of the United States, the Secretary of the Treasury, in his discretion, may require any or all individuals, partnerships, associations and corporations to pay and deliver to the Treasurer of the United States any or all gold coin, gold bullion, and gold certificates owned by such individuals, partnerships, associations and corporations."

The above act was held constitutional by the Supreme Court in Norman v. Baltimore & O. R. Co., 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352, and Nortz v. United States, 294 U.S. 317, 55 S.

Ct. 428, 79 L.Ed. 907, 95 A.L.R. 1346. But it is argued that its provisions did not affect the complainant if the latter, as is claimed, was not in business or, to use the common legal terms, was not "found" or "present" within the United States. It may be said in support of this contention that the Attorney General rendered an opinion on May 25, 1933, to the effect that the Executive Order of April 5, 1933, No. 6102, 12 U.S.C.A. § 248 note, promulgated under the act, had no concern with foreign owners of gold not within the United States. That opinion, however, by its very terms, did not purport to construe the act, but only the Executive Order of April 5, 1933.

The Executive Order of the President, dated April 20, 1933, No. 6111, 12 U.S.C.A. § 95 note, was broader than his April 5th order. It empowered the Secretary of the Treasury to prohibit the export or withdrawal of currency from the United States "by any individual * * * within the United States." This was the basis for the refusal by the Treasury Department to grant an export license to Ladenburg, Thalmann & Co., who were the complainant's bailees and persons "within the United States."

Even if the provisions of section 3 of the Emergency Act (12 U.S.C.A. § 248(n), authorizing the Secretary of the Treasury to requisition gold, were limited to acquiring gold from an owner within the United States, section 2 (12 U.S.C.A. § 95a) authorized the President to prohibit "export" of the gold "by any person within the United States," and thus justified the denial of an export license to a foreign owner who would be obliged either to come here in order to obtain delivery of his gold or to act through an agent "within" the jurisdiction who could not under the terms of the Executive Order obtain an export license.

*Gold Reserve Act of January 30, 1934.*

■ If we should assume, for the purposes of argument, as did the court below, that the Emergency Act of 1933 did not apply to an owner of gold who was without the United States, yet the complainant was precluded from exporting or hoarding the gold by the Gold Reserve Act of January 30, 1934.

That act contains the following provisions:

"Sec. 3. The Secretary of the Treasury shall, by regulations issued hereunder, with the approval of the President, prescribe the conditions under which gold may be acquired and held, transported, melted or treated, imported, exported, or earmarked: (a) for industrial, professional, and artistic use; (b) by the Federal Reserve banks for the purpose of settling international balances; and, (c) for such other purposes as in his judgment are not inconsistent with the purposes of this Act [section 441 and this section]. Gold in any form may be acquired, transported, melted or treated, imported, exported, or earmarked or held in custody for foreign or domestic account (except on behalf of the United States) only to the extent permitted by and subject to the conditions prescribed in, or pursuant to, such regulations." (31 U.S. C.A. § 442).

"Sec. 4. Any gold withheld, acquired, transported, melted or treated, imported, exported, or earmarked or held in custody, in violation of this Act [sections 441 and 442] or of any regulations issued hereunder, or licenses issued pursuant thereto, shall be forfeited to the United States, and may be seized and condemned by like proceedings as those provided by law for the forfeiture, seizure, and condemnation of property imported into the United States contrary to law; and in addition any person failing to comply with the provisions of this Act [said sections] or of any such regulations or licenses, shall be subject to a penalty equal to twice the value of the gold in respect of which such failure occurred." (31 U.S.C.A. § 443).

"Sec. 11. The Secretary of the Treasury is hereby authorized to issue, with the approval of the President, such rules and regulations as the Secretary may deem necessary or proper to carry out the purposes of this Act [sections 441–443 and 822a of this title]." (31 U.S.C.A. § 822b).

In section 16 of the act it is provided that: "If any provision of this Act [said sections], or the application thereof to any person or circumstances, is held invalid, the remainder of the Act [said sections], and the application of such provisions to other persons or circumstances, shall not be affected thereby." (31 U.S.C.A. § 445).

However doubtful may be the applicability of the Emergency Act of 1933 to complainant's gold, there can be no question that the Gold Reserve Act of 1934

230

covers it. The unqualified use of the word "gold" in section 3 (31 U.S.C.A. § 442), and the provision in that section that "gold in any form may be * * * exported * * * or held in custody for foreign or domestic account * * * only to the extent permitted by, and subject to the conditions prescribed in, or pursuant to, such regulations," show the all-inclusive character of the enactment. The provisions of section 4 (31 U.S.C.A. § 443), which penalize holding "in custody" "any gold," further warrant a construction of the act which renders it applicable to complainant's coins.

If, as was thought, our financial system was in peril by reason of withdrawals of gold, it is hard to see why legislation should be enacted which did not apply to the gold of nonresident aliens as fully as to that of our own citizens or to discover upon what ground the rights of foreign citizens should be privileged. Nor is it easy to suppose that the gold supply of the United States would have been allowed to leak out to other countries at a time when it was the policy of Congress to accumulate gold in the Treasury for governmental use.

We can attach little weight to the argument that, if the forfeitures and penalties provided in the act apply to the gold in question the law is invalid as an ex post facto enactment, and that therefore the statute should be construed to relate only to future transactions. The forfeitures provided for in section 4 manifestly are aimed at any persons who continue to hold or who export gold after the passage of the act. Complainant would only be doing this if it adhered to its position after the act of 1934 went into effect. We think the act is in no respect an ex post facto law or objectionable as such.

It is further contended that the act is unconstitutional because it involves an invalid delegation of legislative powers to the Secretary of the Treasury. In general it prohibits holding in custody or exporting gold in any form except to the extent permitted. The exceptions which the Secretary is authorized to make in respect to holding in custody or exporting certain gold are specifically set forth in section 3 (31 U.S.C.A. § 442). They relate to gold held "(a) for industrial, professional, and artistic use, (b) by the Federal Reserve banks for the purpose of set-

tling international balances." In formulating these two classes which may be excepted from the general prohibitions of the statute, Congress set up sufficient standards and effected a lawful delegation. If subdivision (c) (31 U.S.C.A. § 442(c), which enabled the Secretary also to except gold held "for such other purposes as in his judgment are not inconsistent with the purposes of this Act," involves a delegation so broad as to be invalid, the remainder of the act is separable and is saved from criticism because of any invalidity of subdivision (c), for the reason that section 16 (31 U.S.C.A. § 445), which we have quoted, so provides.

A letter from the Acting Secretary of the Treasury, T. J. Coolidge in May, 1935, denied the application of complainant for license to export the gold and ordered the applicant and Ladenburg, Thalmann & Co. to deliver the gold to the Federal Reserve Bank of New York for the account of the Treasurer of the United States against payment as provided by the instructions issued by the Secretary of the Treasury on January 17, 1934. The instructions referred to in the letter of Mr. Coolidge provided for payment for the gold coin at "the dollar face amount." They were ratified and approved by section 13 of the Gold Reserve Act of 1934 (31 U.S.C.A. § 824). Ladenburg, Thalmann & Co. were attempting to comply with this order when stopped by a restraining order in this suit.

It is entirely clear from the decision of the Supreme Court in Nortz v. United States, 294 U.S. 317, 55 S.Ct. 428, 79 L. Ed. 907, 95 A.L.R. 1346, that the payment proposed in the Coolidge letter would be lawful compensation and that the gold, as it could not be sold here or exported to a country where it would be worth more in the market, cannot be said to have had a unique value. Consequently a bill in equity based upon the unconstitutionality of the act and the unique value of the gold must fail, since there is an adequate remedy at law to recover its value in legal tender. Accordingly, we think that there was no ground for bringing a suit in equity. Nor do we see that there can be a recovery at law, since Ladenburg, Thalmann & Co. are bound to deliver the gold pursuant to the order of the Secretary of the Treasury.

We fully concur in the reasoning and the result reached by Judge Caffey in the court below, and have only dealt somewhat fully with the case because of the

earnest argument on behalf of the complainant upon the appeal to this court. As we view the situation, complainant has shown no basis for a preliminary injunction, and the facts alleged in the bill fail to set forth any cause of action.

The order and decree are affirmed.