## BRITISH–AMERICAN TOBACCO CO., LIMITED, v. FEDERAL RESERVE BANK OF NEW YORK.
### No. 252.

Circuit Court of Appeals, Second Circuit.
June 12, 1939.

White & Case, of New York City (Joseph M. Hartfield and Roy H. Callahan,

both of New York City, of counsel), for appellant.

Walter S. Logan, of New York City (Dean G. Acheson, of Washington, D. C., John G. Laylin, of New York City, and W. Graham Claytor, Jr., of Washington, D. C., of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

PER CURIAM.

We can dispose of this case upon a single issue: i. e. that the plaintiff has at most proved no more than nominal damages; for, if so, Nortz v. United States, 294 U.S. 317, 55 S.Ct. 428, 79 L.Ed. 907, 95 A.L.R. 1346, rules, as we shall show. First, however, it is necessary to consider, whether, regardless of any other question, it was proper for the district judge to dismiss the complaint and award costs against the plaintiff, if only nominal damages were at stake. The action is in conversion, and we shall assume, arguendo, that when the plaintiff in such an action proves nominal damages, he is entitled to costs. However, the jurisdiction of the district court in the case at bar rested upon § 41(1) (a) or § 41(1) (c) of Title 28, U.S.Code, 28 U.S.C. A. § 41(1) (a, c) which require that the amount in controversy shall be $3,000 or more; and § 815 of Title 28, U.S.Code, 28 U.S.C.A. § 815, provides that whenever "the amount in dispute" must be more than $500 for the "case" to "be brought" in a district court, the plaintiff shall not recover costs, if his damages are less than that sum, and that costs may be awarded against him in the court's discretion. Thus it follows that the plaintiff here could recover no costs, if its damages were nominal, and since it would be a clear abuse of discretion not to award costs against it, in that event, there will be nothing left to decide.

Nortz v. United States, supra (294 U.S. 317, 55 S.Ct. 428, 79 L.Ed. 907, 95 A.L.R. 1346), differs from the case at bar in two particulars: the property there alleged to have been converted was gold coin, and not bullion; and the conversion was on January 17, 1934, after the promulgation of the orders of the Secretary of the Treasury of December 28, 1933, and January 15, 1934, which unequivocally directed the surrender of gold coin and bullion. We reserve for the moment any supposed difference between coin and bullion, and take up the situation before December 28,

1933. We shall assume that the plaintiff could have recovered substantial damages, if, upon redelivery to it of its bullion, it would have had unfettered disposition of it between November 24, 1933, the date of the supposed conversion, and December 28, 1933, the date of the secretary's order. We are therefore to inquire whether during that period the possessor of gold bullion was free to sell it for whatever value he could get in some ascertainable market, lawfully open to him. The answer depends upon the statutes and executive orders in force during that period. We shall not go beyond the Act of March 9, 1933, 48 Stat. 1; the President's order of April 5, 1933, No. 6102, and the regulations of the Secretary of the Treasury of April 29, 1933.

Section two of the Act of March 9th, 1933, 50 U.S.C.A. Appendix § 5, provided that: "the President may, through any agency that he may designate, * * * prohibit, under such rules and regulations as he may prescribe, * * * export, hoarding, melting, or earmarking of gold or silver coin or bullion or currency, by any person within the United States or any place subject to the jurisdiction thereof". Section three, 12 U.S.C.A. § 248(n), declared that "Whenever in the judgment of the Secretary of the Treasury such action is necessary * * * the Secretary * * may require any * * * corporations to * * * deliver to the Treasurer * * * all gold coin, gold bullion, and gold certificates. * * * Upon receipt of such gold coin, gold bullion or gold certificates, the Secretary * * * shall pay therefor an equivalent amount of any form of coin or currency coined or issued under the laws of the United States." Section two of the executive order of April 5, 1933 "required" all persons "to deliver on or before May 1, 1933, to a Federal reserve bank or a branch or agency thereof or to any member bank of the Federal Reserve System all gold coin, gold bullion and gold certificates now owned by them", with certain exceptions not relevant here. Section four authorized the payment prescribed by § 3 of the Act of March 9, 1933. On April 29, 1933, the secretary promulgated certain regulations, section one of Art. 5 of which concerned "Licenses for Proper Transactions and for Purposes not Covered in Preceding Articles". The important part of this section is the following: "any person showing the need for gold coin or gold bullion for a proper transaction not

involving hoarding, or for gold coin or gold bullion for purposes specified in the Executive Order of April 5, 1933, and not covered by the foregoing articles of these regulations may make application to the Secretary of the Treasury for a license to purchase, or if such coin or bullion is already in his possession to retain such coin or bullion". There then followed a description of what the application should contain.

Thus it will be observed that the Act of March 9th gave power to the President to prohibit the "export, hoarding, melting, or earmarking" of bullion, and that in execution of this power he required its delivery to some bank, where it could be made certainly available. What better means he could have devised to prevent its "export" or "hoarding", we find it hard to imagine. The whole effort of Congress was to prevent the escape of gold, of which export and hoarding were almost, if not quite, the only available routes. These stopped, the emergency might pass; to stop them it was necessary to have the metal in all its forms where it could be found. That the owner could be compelled to accept the current price for it, has been decided for us; we have only to consider whether the order was within the power granted. We think it was, but to make assurance doubly sure we can also rely upon the regulation quoted above. If the President's order required adoption by the secretary, he there adopted it, not only by making his regulation rest upon it—among other sources of authority—but by expressly mentioning it in § 1 of Article V, as we have seen. Even standing alone and without the assistance of the order of April 5, that section made the possession of bullion unlawful without a license, for the very exaction of a license necessarily so presupposed; and whatever may be the doubts which could arise as to the President's power to issue the order, there can be no cavil as to the secretary's to make the regulation. We hold therefore that during the period in question—November 24, 1933 to December 28, 1933—the plaintiff, even if the defendant had complied with its demand, would have been bound at once to hand back the bullion, and it follows that the defendant's refusal caused it no substantial damages under Nortz v. United States, supra (294 U.S. 317, 55 S. Ct. 428, 79 L.Ed. 907, 95 A.L.R. 1346).

The argument need not detain us that though Congress might sequester and confiscate gold coin, it could not do the same with bullion. As we have already said, the occasion for its action was to prevent the flight of the metal, of which the most likely, if not the only, means were export and hoarding. The value of the dollar was fixed by its weight in gold, and still is; and to prevent its collapse, the metal must be kept where it could be used, which meant in ascertained places within the United States. Gold coin is no more than gold measured very accurately; transactions can be carried on by the means of the metal, and have been, again and again in the past. Indeed, while gold coins were themselves in use, the common practice was for banks to weigh them before delivery—a recognition that their value lay only in their content. Hence, unless the power extended to bullion, an irresistible incentive would have existed to realize the latent profit by melting coins. However circumscribed the power, it was essential to its effective exercise that this inducement at least should be removed, and that could not be done without including all bullion, since coins bear no earmark, once melted.

Finally, it is argued that even though the statute was valid against citizens, it could not have been meant to reach aliens. We answered this in Uebersee Finanz-Korporation v. Rosen, 2 Cir., 83 F.2d 225, to which we need only refer. The plaintiff seems also to suppose that the power of the United States is subject to some international limitation, which, as we understand it, its municipal judges must recognize and apply, as a kind of overriding jus gentium. However convenient such a revival of the old theory of "Natural Rights" may be in diplomatic dealings with feebler nations, it is not otherwise to be taken seriously.

Judgment affirmed.