## UNITED STATES v. LEVY.
### No. 284.

Circuit Court of Appeals, Second Circuit.

Aug. 10, 1943.

A. L. Sainer and Maurice F. Cantor, both of New York City (A. L. Sainer, of New York City, on the brief), for appellant.

Edith A. Glennon, Asst. U. S. Atty., of New York City (Mathias F. Correa, U. S. Atty., of New York City, on the brief), for appellee.

Before SWAN, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

Appellant, Isidore Levy, was convicted by a jury under an indictment charging a willful and knowing possession and retention of an interest in gold bullion on or about April 22, 1942, without a license, in violation of Executive Order Aug. 28, 1933, No. 6260, §§ 5, 10, 12 U.S.C.A. § 95 note, 31 CFR 50.5, 50.10, issued by the President of the United States pursuant to Sec. 2 of the Emergency Banking Relief Act of March 9, 1933, 12 U.S.C.A. § 95a. He was sentenced to six months' imprisonment and fined $2,500. His appeal, besides raising certain incidental questions concerning the conduct of his trial, particularly challenges the sufficiency of the indictment and the legality of his conviction on the two grounds that Executive Order 6260 was not authorized by the Act and that in any event it was inapplicable, since he had in his possession only melted scrap gold, not gold bullion within the scope of the Order.

Appellant was apprehended in New York City on April 22, 1942, with five bars of melted gold jewelry which he had taken from his safe deposit box in the Manufacturers Trust Co. Another bar was discovered in his safe deposit box in National City Bank. He claimed at the trial that he was holding these bars as collateral for money loaned to one Stelmon to purchase the jewelry some ten years previously and that he honestly believed Stelmon held a license to acquire and hold gold. Actually Stelmon had a license to acquire and hold only unmelted scrap gold, and this he obtained only some months after the jewelry had been melted down into bars. Prior contradictory statements of both appellant and Stelmon also tended to show that appellant was engaging in an independent venture as sole owner of the gold. The jury was thus clearly justified in finding that he held the gold willfully and knowingly without a license. And appellant indeed does not now contest the conclusiveness of this finding, but simply challenges the alleged illegality of his act.

Appellant's first point is that statutory power to the President to prohibit hoarding of gold bullion did not authorize regulations requiring the delivering of such bullion to government representatives— that the power to require delivery was given only to the Secretary of the Treasury by another statute carrying only a civil, and not a criminal, penalty. And he relies particularly on a decision of Judge Woolsey in 1933, sustaining a demurrer to an indictment on this ground, Campbell v. Chase Nat. Bank of City of New York, D.C.S.D.N.Y., 5 F. Supp. 156,[1] followed by Judge Brewster in United States v. Driscoll, D.C.Mass., 9 F.Supp. 454. Decision on this point requires consideration of the two statutes referred to, as well as the actions of the President and the Secretary of the Treasury with respect to them, and the effect of a validating act passed by Congress on January 30, 1934, 12 U.S.C.A. § 213.

Sec. 2 of the Act of Mar. 9, 1933, 12 U.S.C.A. § 95a, was an amendment of § 5(b) of the Trading With the Enemy Act of 1917, 50 U.S.C.A.Appendix, § 5(b). An amendment of 1941, 50 U.S.C.A.Appendix, § 616, does not change it in aspects here material. The Act provides that "During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, investigate, regulate, or prohibit, under such rules and regulations as he may prescribe, by means of licenses or otherwise, any * * * hoarding, melting, or earmarking of gold or silver coin or bullion or currency, by any person within the United States," with penalties of fine and imprisonment for willful violation of the statute or any regulation issued under it.

Sec. 3 of the same Act amended § 11 of the Federal Reserve Act of 1913, 12 U.S.C.A. § 248(n). This provided that "Whenever in the judgment of the Secretary of the Treasury such action is necessary to pro-

---

[1] Also involved in the case were injunctions sought against the Bank and the United States Attorney. The appeal of the United States was dismissed on its own motion. United States v. Campbell, 291 U.S. 686, 54 S.Ct. 455, 78 L.Ed. 1073. Denials of the injunctions were affirmed, 2 Cir., 71 F.2d 669, 94 A.L.R. 708, certiorari denied 293 U.S. 592, 55 S.Ct. 108, 79 L.Ed. 686, and Campbell v. Medalie, 2 Cir., 71 F.2d 671.

tect the currency system of the United States, the Secretary of the Treasury, in his discretion, may require any or all individuals, partnerships, associations, and corporations to pay and deliver to the Treasurer of the United States any or all gold coin, gold bullion, and gold certificates" owned by the persons described. And for this the Secretary was required to pay an equivalent amount of any other form of coin or currency of the United States, as well as the costs of transportation and other incidental expenses. Noncompliance was subject to a penalty equal to twice the value of the gold or gold certificates involved, to be collected by the Secretary by suit or otherwise.

Under Sec. 2, the President on April 5, 1933, issued Executive Order 6102, which required that all gold bullion acquired before or on April 28, 1933, be turned over to a Federal Reserve bank or member bank of the Federal Reserve System by May 1, 1933, and that all gold bullion acquired after April 28 be likewise turned over within three days—subject to licensed exceptions here unimportant—in return for payment of an equivalent amount of United States coin or currency. This order was revoked, without prejudice to rights and liabilities which had theretofore accrued, by Executive Order 6260, which was issued August 28, 1933, and which forms the basis of this prosecution. Sec. 5 of the Order provides that "After 30 days from the date of this order no person shall hold in his possession or retain any interest, legal or equitable, in any * * * gold bullion," except under license to be issued by the Secretary of the Treasury for exceptions again here irrelevant. Sec. 10 restates the penalty provision of Sec. 2 of the Act of Mar. 9, 1933. And it was further provided that the Secretary of the Treasury might issue such regulations as he deemed necessary to carry out the provisions of the Order.

Pursuant to this authority the Secretary on September 12, 1933, issued regulations requiring the filing of returns by owners of gold bullion and the keeping of records of acquisitions and deliveries of gold for use in industry, profession, or art. On December 28, 1933, and January 15, 1934, the Secretary issued further regulations requisitioning all gold bullion—except for presently unimportant licensed exceptions—and setting January 17, 1934, as the dead line date for all deliveries to the Treasury

for payment, failure of compliance by that time to be penalized under Sec. 3 of the Act of Mar. 9, 1933.

On January 30, 1934, the Gold Reserve Act of 1934 was enacted, which by § 13, 12 U.S.C.A. § 213, approved, ratified, and confirmed all orders and regulations of the President and of the Secretary of the Treasury issued under these and certain other specifically designated statutes.

The record does not disclose with certainty when appellant acquired possession of the gold bars. To take the position most favorable to his argument that Executive Order 6260 was unauthorized by the Act of Mar. 9, 1933, we assume this occurred prior to January 30, 1934. For if it occurred thereafter, the congressional ratification then had would at least give Executive Order 6260 prospective validity against subsequent violations. Ruffino v. United States, 9 Cir., 114 F.2d 696. But under our assumption, if the order was originally unauthorized an ex post facto application of criminal liability apparently results. It is true that the Treasury Regulations of September 12, 1933, may have impliedly adopted it and given at least some portions of it validity under Sec. 3 of the Act of Mar. 9, 1933. Cf. British-American Tobacco Co. v. Federal Reserve Bank of New York, 2 Cir., 104 F.2d 652, affirmed, 2 Cir., 105 F.2d 935, certiorari denied 308 U.S. 600, 60 S.Ct. 131, 84 L.Ed. 502. They could not, however, sanction the penalty thereby imposed, since Sec. 3 clearly limited the Secretary's authority in this respect to the penalty specified. On this view, therefore, appellant, when the ratification provision was enacted, had at most subjected himself to a civil penalty equal to twice the value of his gold—either under the Secretary's implied adoption of Executive Order 6260 or under the Secretary's own orders of December 28, 1933, and January 15, 1934. To apply that provision now to penalize appellant's prior acquisition and retention of the gold bars would seem clearly ex post facto and illegal. Cf. Shepherd v. People, 25 N.Y. 406.

It is not an answer to say that only the retention after January 30, 1934, is sought to be penalized, cf. Uebersee Finanz-Korporation Aktien Gesellschaft v. Rosen, 2 Cir., 83 F.2d 225, certiorari denied 298 U.S. 679, 56 S.Ct. 946, 80 L.Ed. 1400, for the ratification provision by its terms, being dependent upon Executive Order 6260, operated against the retention as a continuous

act from the effective date of that Order. Appellant was given no opportunity on January 30, 1934, to turn in his gold without exposing himself to the penalty of Executive Order 6260 and Sec. 2 of the Act of 1933. And, indeed, had he then fairly attempted to do so, he would in any event have subjected himself to a penalty of twice the value of his gold under the regulations of the Secretary of the Treasury.

■ But appellant nevertheless cannot succeed on this ground, for we are convinced that Executive Order 6260 was authorized by the Act of Mar. 9, 1933. This court implied as much in British-American Tobacco Co. v. Federal Reserve Bank of New York, supra, 2 Cir., 104 F.2d at page 654, in reasoning which we adopt. In answering the contention that the Act empowering the President to prohibit gold exporting or hoarding did not authorize its requisition for purchase, the Court said, per curiam: "What better means he could have devised to prevent its 'export' or 'hoarding', we find it hard to imagine. The whole effort of Congress was to prevent the escape of gold, of which export and hoarding were almost, if not quite, the only available routes. These stopped, the emergency might pass; to stop them it was necessary to have the metal in all its forms where it could be found. That the owner could be compelled to accept the current price for it, has been decided for us; we have only to consider whether the order was within the power granted. We think it was." Compare, also, United States v. 71.41 Ounces of Gold Filled Scrap, 2 Cir., 94 F.2d 17.

■ There is no inconsistency in the enactment of two separate statutory provisions for the requisition of gold, but with quite different penalties for hoarding, so long as they were designed—as clearly these were—to perform different functions. Cf. United States v. Kushner, 2 Cir., 135 F.2d 668, certiorari denied 63 S.Ct. 1449, 87 L.Ed. ——. Sec. 2 of the Act of Mar. 9, 1933, was devised to operate against greater emergencies than Sec. 3; and, therefore, the imposition of more severe penalties was appropriate. And whereas the penalty provision of Sec. 2 is applicable only to a willful violator, that of Sec. 3 is applicable to any violator, innocent or not, focusing its attention on the practical matter of removing the gold from circulation. See Farber v. United States, 9 Cir., 114 F.2d 5,

8, certiorari denied 311 U.S. 706, 61 S.Ct. 173, 85 L.Ed. 458.

■ Turning to appellant's second point, we are clear that the six bars of melted scrap jewelry held by him were gold bullion within the terms of the authorizing act and the Presidential order. The jewelry was not of pure gold, some being gold plate, some gold filled, and some solid gold. It cannot reasonably be contended that Congress intended a general exemption of this scrap gold, once melted, since that would substantially weaken the effectiveness of the Act in preventing gold hoarding and exporting. See British-American Tobacco Co. v. Federal Reserve Bank of New York, supra, 2 Cir., 104 F.2d at page 654. And there was convincing expert testimony that melted scrap gold is generally considered gold bullion. The Secretary of the Treasury, too, in promulgating regulations concerning scrap gold must necessarily have considered it bullion within his authority to regulate under the Act. Witness his regulations issued September 12, 1933, requiring records of acquisitions and holdings of unmelted scrap gold; and see, also, Provisional Regulation No. 12, issued under the Gold Reserve Act of 1934, for licensing the melting of gold, 31 CFR 54.12, and Provisional Regulation No. 35(c), for the purchase of gold filings, clippings, pieces, and the like, 31 CFR 54.35(c).

■ It was generally understood when Executive Order 6260 was issued that gold bullion included gold in a form containing varying degrees of base metals. See 31 U.S.C.A. §§ 327, 329, 332, 360, 361. And at the trial one expert testified that the gold content of bullion need be no more than one-tenth of one per cent. True, the Treasury Regulations issued January 15, 1934, set a somewhat higher standard defining gold bullion as "any gold which has been put through a process of smelting or refining that is in such form that its value depends upon the gold content and not upon the form, but does not include gold coin or metals containing less than 5 troy ounces of fine gold per short ton." See 31 CFR 52.4. And the Provisional Regulations issued under the Gold Reserve Act in effect adopted this definition. See 31 CFR 54.4. But in any event, there was expert testimony that the bars here were within this definition. And although other expert testimony was to the contrary, the question was for the jury; and its finding of guilt settles the matter.

Error during the trial was assigned for failure of the court to declare a mistrial because of the question of the United States Attorney to Stelmon, whether he did not testify in a recent New York state murder trial that he had purchased a stolen ring from the "defendant." The reference seems rather clearly to the defendant in that trial, and not to the appellant here. In any event, the claim is without merit, for the witness answered in the negative, and no attempt was made to impeach him. The testimony thus could have had no significance upon the contested issue whether the appellant had unlawfully hoarded gold bullion. Cf.. United States v. Kushner, supra. Error assigned as to the refusal of the court to give requested instructions to the jury that appellant must have acted willfully and knowingly is likewise without merit, since the court charged in its own language that a willful intent was an essential ingredient of the crime. It was not required to adopt the phraseology of the requested instructions. Id.

Judgment affirmed.