WERNER ALEXEWICZ, Plaintiff, *v.* GENERAL ANILINE & FILM CORPORATION, Defendant.

Supreme Court, Special Term, Broome County, August 26, 1943.

*A. E. Gold* for plaintiff.

*Neil G. Harrison* and *L. B. Wardrop, Jr.,* for defendant.

*Harry LeRoy Jones, Special Assistant United States Attorney-General, amicus curiæ.*

DEYO, J. This is an action for breach of a written contract of employment between the plaintiff, a naturalized American citizen of German descent, and the defendant, a Delaware corporation authorized to do business in the State of New York, most of the stock of which was owned or controlled by German nationals at the outbreak of the war and which was, therefore, taken over by the Secretary of the Treasury and subsequently vested in the Alien Property Custodian, pursuant to Executive Order.

There is little or no dispute as to the facts and no triable issue thereof is presented. Briefly, it appears that the plaintiff, having been born and educated in Germany, and having served in the German army from 1914 to 1919, came to this country in 1931 and secured employment as a chemist with the Agfa-Ansco Corporation, later merged into the defendant corporation. In 1938 the plaintiff became a naturalized citizen of the United States. Under date of May 1, 1941, the contract of employment herein involved was executed, which, by its terms,

was to continue in force until December 31, 1944. On June 14, 1941, the provisions of Executive Order No. 8389, as amended [issued April 10, 1940, 5 Federal Register, p. 1400; amd. Ex. Ord. No. 8785, issued June 14, 1941, 6 Federal Register, p. 2897], were extended to include German nationals, and since that date the defendant has been operating only as authorized by licenses issued by the Treasury Department. Shortly after the outbreak of the war with Germany, and on or about December 12, 1941, the Secretary of the Treasury took possession of the defendant's office and assumed active supervision over its business. On January 1, 1942, the Secretary of the Treasury issued a new license to the defendant. On February 12, 1942 [by Memorandum of the President, 7 Federal Register, p. 1409], all powers conferred upon the President by the Trading with the Enemy Act (U. S. Code, tit. 50, Appendix, § 1 *et seq.*) were delegated to the Secretary of the Treasury, and Robert M. Anderson, a Treasury representative, was assigned to the business of the defendant. On February 16, 1942, the Secretary of the Treasury took over most of the corporate stock of the defendant, which prior to that time had been owned and controlled directly or indirectly by nationals of a foreign country. On February 27, 1942, Mr. Anderson caused a notice to be served upon the plaintiff, terminating his connection with the defendant. On March 27, 1942, Mr. A. E. Marshall, vice-president of the defendant corporation, refused to permit the plaintiff to return to work, because of the Treasury Department's action.

The defendant contends that it is absolved from liability to the plaintiff by reason of the action of the Treasury representative in terminating the contract of employment. The plaintiff, on the other hand, denies the validity of the Treasury representative's action and questions the constitutionality of subdivision (b) of section 5 of the Trading with the Enemy Act, from which, in part at least, the Treasury representative derived his authority.

In an approach to the problem, it becomes necessary to analyze the two methods utilized by the Government in exerting control over the business affairs of this defendant and other foreign nationals. The original Trading with the Enemy Act, as adopted October 6, 1917 (40 U. S. Stat. 411), as the title implies, forbade commercial intercourse with persons residing in and corporations incorporated in countries with which we were then at war, except pursuant to Presidential license, and included provisions for the transfer of enemy-owned property,

including corporate stock, to the Alien Property Custodian. Subdivision (b) of section 5 of the Act [U. S. Code, tit. 50, Appendix, § 5, subd. (b), par. (1)], with which we are immediately concerned, empowered the President " to investigate, regulate or prohibit," transactions in foreign exchange, property transfers and the like between residents of foreign countries by any person within the United States. The Act, and particularly subdivision (b) of section 5, was amended from time to time to provide the President with necessary Congressional authority to act in various emergencies other than those arising in time of war.

Up until the First War Powers Act, 1941 [U. S. Code, tit. 50, Appendix, § 601 et seq.], subdivision (b) of section 5 of the Trading with the Enemy Act was concerned only with the regulation of foreign exchange, bank credits and similar matters, and obviously was primarily intended to be used as a method to prevent the withdrawal of cash assets from banking institutions when public welfare so required. The authority therein granted was exercised by means of executive orders and licenses. Executive Order No. 8389, dated April 10, 1940, which itself was but an amendment of an earlier order, regulated transactions in foreign exchange and transfers of credit involving Norway and Denmark or any national thereof by means of a system of licenses to be granted by the Secretary of the Treasury. Thereafter, as other countries were invaded or subjected to the domination of the Axis powers, this " freezing order ", so-called, was immediately made applicable, until at length, on June 14, 1941, the scope of freezing control was extended to all continental Europe, with the exception of Turkey. The primary purpose of this order, however, remained the same throughout its various amendments — the regulation of credit and foreign exchange. As Judge LOUGHRAN said, in *Polish Relief Commission* v. *Banca Nationala a Rumaniei* (288 N. Y. 332, 337) : " The Executive Order is a check upon trading with the enemy. Its prime purpose is to stop such uses of foreign property rights as might imperil national defense."

In accordance with these various " freezing orders " and on the direction of the President, the Secretary of the Treasury inaugurated a system of licenses whereby various business enterprises of foreign nationals were permitted to be continued in varying degrees under the supervision and control of the Treasury Department. Since the Treasury Department had full and complete control of the financial transactions of any given individual or corporation under such Executive Orders, it could

and did exert virtual control over all of its business activities, for the Department was empowered to license a foreign national and to permit it to use its financial resources only to that extent which the Department deemed was in accordance with public welfare.

The constitutionality of subdivision (b) of section 5 of the Trading with the Enemy Act prior to the 1941 amendment and the Executive Orders and licenses granted thereunder is well established and cannot seriously be questioned. (*Uebersee Finanz-Korporation* v. *Rosen,* 83 F. 2d 225, 228; certiorari denied 298 U. S. 679; *Norman* v. *Baltimore & Ohio R. R. Co.,* 294 U. S. 240; *Perry* v. *United States,* 294 U. S. 330.) More recently its constitutionality and that of Executive Order 8389 were upheld. (*United States* v. *Von Clemm,* 136 F. 2d 968.)

On December 18, 1941, when subdivision (b) of section 5 was amended by title III of the First War Powers Act, 1941 [U. S. Code, tit. 50, Appendix, § 616], its scope was vastly increased and the President was given authority not only to regulate the financial transactions of foreign nationals, but to " regulate, direct and compel, nullify, void, prevent or prohibit " every sort of commercial transaction involving every sort of property in which any foreign country or any national thereof had any interest. The President's authority to delegate this power and to define the terms used was continued. Moreover, everything previously done by the President or by the Secretary of the Treasury, including orders and regulations issued pursuant to the authority of the old Trading with the Enemy Act, was specifically ratified and confirmed. This Act brought into being the second and more complete method of controlling the business affairs of nationals of foreign countries. The older method, directed against financial transactions only, continued under the system of Executive Orders and licenses already being utilized. The new method, in effect, gave the President or his representative complete power with respect to all of the transactions of a foreign national. On February 12, 1942, the President delegated these new broad, comprehensive powers to the Secretary of the Treasury (Memorandum of the President, 7 Federal Register, p. 1409). That the two methods of control stem from the same statute and that the President designated the same agency to administer both forms of control is purely incidental.

The constitutionality of the new Act has not been passed upon, so far as I am aware. However, the decisions relative to the earlier section seem to me to point the way to a similar holding as to the latter. If the Congress acted within its author-

ity in delegating the power to regulate one form of transaction, i. e., financial, it must naturally follow that it possessed similar authority to delegate power to regulate other transactions. If, however, we disregard these earlier decisions and approach the subject *de novo,* I am still of the opinion that the section does no violence to our basic law.

The framers of our Constitution foresaw that the exigencies of war demanded a comprehensive, all-inclusive grant of power and so expressly gave to Congress, without any limitation or reservation whatsoever, the right to make all laws necessary and proper in time of war or for the defense of our country. (U. S. Const. art. I, § 8.) This power to wage war " is a power to wage war successfully, and thus it permits the harnessing of the entire energies of the people in a supreme coöperative effort to preserve the nation." (*Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 426.) By necessity wartime powers are broad. (*United States* v. *Hirabayashi,* 46 F. Supp. 657, 661.) In fact, such powers are " well-nigh limitless ". (*United States* v. *Macintosh,* 283 U. S. 605, 624.) True, this power is subject in its exercise to the Fifth Amendment, but as was said in *Henderson* v. *Kimmel* (47 F. Supp. 635, 642): " If the Act is an appropriate means to a permitted end, there is little scope for the operation of the Due Process Clause."

" Rights of the individual, under our federal Constitution and its amendments, are not absolute. When such rights come into conflict with other rights granted for the protection and safety and general welfare of the public, they must at times give way. There is no individual right so absolute that it may be exercised under any and all circumstances, and without any qualification." (*Matter of Kanai,* 46 F. Supp. 286, 288.)

By its terms Congress sought to confer upon the President or his representative the broadest possible authority over the property of foreign nationals, in order to forestall the possibility that such property might be utilized for purposes hostile to the common defense. The means employed by the Act to attain this end were, I believe, entirely appropriate in the light of the situation presented by the present emergency. To permit alien interests, and enemy-alien interests at that, to operate important and vital businesses within our borders in time of war is unthinkable. To suspend such businesses completely, to close their doors and leave their factories idle when the products which they are capable of furnishing are essential to the war effort, is equally inconsistent with our common good. Either practice might conceivably turn to naught all that we seek to

accomplish. The logical and in fact the only alternative is governmental operation, supervision and control. That is what subdivision (b) of section 5 authorizes. That is what occurred.

There might be merit to the plaintiff's contention if it had been his property that had been seized by the government without affording him redress. (*Russian Volunteer Fleet* v. *United States,* 282 U. S. 481; *Garvan* v. *$20,000 Bonds,* 265 F. 447, 479.) Such, however, was not the case. It was the defendant's property that was taken over. Nothing of the plaintiff's has been appropriated by the government. Nothing of his has been confiscated. Rather, the performance of his contract with the defendant has been rendered impossible by law. The continuance of the contractual relationship has been made illegal; its completion has been rendered impossible. This distinction is clearly pointed out in *Omnia Commercial Co.* v. *United States* (261 U. S. 502), where the court said, at page 510: " The conclusion to be drawn from these and other cases which might be cited is, that for consequential loss or injury resulting from the lawful governmental action, the law affords no remedy.  *  *  * If, under any power, a contract or other property is *taken* for public use, the Government is liable; but if injured or destroyed by lawful action, without a taking, the Government is not liable."

Holding as I do, that subdivision (b) of section 5 of the Trading with the Enemy Act, both before and after the 1941 amendment, is constitutional, we must next turn to the question of whether or not the powers granted thereunder were properly executed in the present case, either by virtue of the Executive Orders and licensing provisions relating to financial transactions or by virtue of the new amendment or through a combination of both.

The pertinent provisions of the First War Powers Act, 1941 [U. S. Code, tit. 50, Appendix, § 616], which amended subdivision (b) of section 5 of the Trading with the Enemy Act, read as follows: " (1) During the time of war  *  *  * the President may, through any agency that he may designate,  *  *  * and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise  *  *  *

" (B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest, by any person, or with respect to any property, subject to the

jurisdiction of the United States; and any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President, in such agency or person as may be designated from time to time by the President, and upon such terms and conditions as the President may prescribe such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes; * * *

" (2) * * * and no person shall be held liable in any court for or in respect to anything done or omitted in good faith in connection with the administration of, or in pursuance of and in reliance on, this subdivision, or any rule, regulation, instruction, or direction issued hereunder. * * *

" (3) * * * *Provided, however,* That the foregoing shall not be construed as a limitation upon the power of the President, which is hereby conferred, to prescribe from time to time, definitions, not inconsistent with the purposes of this subdivision, for any or all of the terms used in this subdivision."

The broad and comprehensive language of the Act clearly indicates that its purpose was to complement the authority of the President as Commander-in-Chief in time of war with all of the broad wartime powers of the Congress over property in which foreign nationals have an interest. This Presidential authority might be exercised through any agency which the President might designate and by any means or method whatsoever. In accordance therewith, the President under date of February 12, 1942, designated the Secretary of the Treasury as the agency to exercise the powers and authority thereby conferred upon him. (Memorandum of the President, 7 Federal Register, p. 1409, *supra.*) Thereafter, and on February 27, 1942, Robert M. Anderson, who had been authorized to act as Treasury representative in the defendant's Binghamton plant by Edward H. Foley, Jr., Acting Secretary of the Treasury, terminated the plaintiff's employment.

It can scarcely be argued that the defendant corporation was not a " national " of a foreign country. It will be noted that subdivision (b) of section 5 of the Act specifically conferred the power upon the President to define the terms therein used. This provision was written into the law by the amendment of December 18, 1941 [First War Powers Act, 1941, § 301; U. S. Code, tit. 50, Appendix, § 5, subd. (b), par. (3); § 616]. Prior to that date the President, by Executive Order No. 8389, as

amended by Executive Order No. 8785 and subsequent amendments, had defined the word " national ", as used in the Trading with the Enemy Act as then written, to include any corporation which had been controlled by or a substantial part of its stock owned or controlled by one or more nationals of certain enumerated foreign countries, including Germany, Switzerland and the Netherlands.  [5 Federal Register, p. 1400; 6 Federal Register, p. 2897.]  This definition of " national " was specifically confirmed and ratified by Act of Congress December 18, 1941 [First War Powers Act, 1941, § 302; U. S. Code, tit. 50, Appendix, § 617], in the following words: " All acts, actions, regulations, rules, orders, and proclamations heretofore taken, promulgated, made, or issued by, or pursuant to the direction of, the President or the Secretary of the Treasury under the Trading With the Enemy Act of October 6, 1917 (40 Stat. 411), as amended, which would have been authorized if the provisions of this Act and the amendments made by it had been in effect, are hereby approved, ratified, and confirmed."

At the time of our entry into the war nationals of the foreign countries above mentioned owned and controlled substantially all of the defendant's stock, according to the affidavits and exhibits presented on this motion.  Obviously, therefore, the defendant was a " national " within the definition given.  Consequently, the action taken, so far as it concerns the property of this defendant, including the contract with the plaintiff, was lawful and proper.

It might also be pointed out that the plaintiff, at the time his contract was canceled, was likewise a " national " of a foreign country, even though he enjoyed and had enjoyed for many years American citizenship.  Executive Order No. 8389, as amended by Executive Order No. 8785, further defined " national " as including any person " acting or purporting to act directly or indirectly for the benefit or on behalf of any national of such foreign country ".  The plaintiff was an employee of the defendant, a " foreign national "; consequently it logically follows that, as its employee, he was acting in its behalf.  Therefore, he too was a " national " of a foreign country.

Since the defendant, and incidentally the plaintiff as well, were " nationals " of a foreign country, the contract was a transaction involving property of a " national " and, hence, was a transaction which the President or his duly appointed agent had the power to regulate and even " nullify, void, prevent or prohibit " under subdivision (b) of section 5 of the Trading

with the Enemy Act, as amended. Pursuant to the authority delegated to the Secretary of the Treasury by the Presidential Memorandum of February 12, 1942, the Treasury Representative, Mr. Anderson, was acting within his authority when he terminated the contract on February 27, 1942. Any possible question on this score was removed by Presidential ratification on July 6, 1942, contained in section 9 of Executive Order No. 9193 (7 Federal Register, p. 5205), which expressly ratified and confirmed any and all action theretofore taken by the Secretary of the Treasury or by any person, agency or instrumentality designated by either of them.

Furthermore, it seems to me that the Treasury representative had the requisite authority to cancel the plaintiff's contract pursuant to Executive Order No. 8389, as amended June 14, 1941, by Executive Order No. 8785 (6 Federal Register, p. 2897), and the license issued to the defendant January 1, 1942, in effect at the time of termination. The Act at that time authorized the President to '' investigate, regulate or prohibit '' the financial transactions of foreign nationals. The Order itself provided in part:

'' SECTION 1. All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury by means of regulations, rulings, instructions, licenses, or otherwise, if (i) such transactions are by, or on behalf of, or pursuant to the direction of any foreign country designated in this Order, or any national thereof, or (ii) such transactions involve property in which any foreign country designated in this Order, or any national thereof, has at any time on or since the effective date of this Order had any interest of any nature whatsoever, direct or indirect: A. All transfers of credit between any banking institutions within the United States; and all transfers of credit between any banking institution within the United States and any banking institution outside the United States (including any principal, agent, home office, branch, or correspondent outside the United States, of a banking institution within the United States);

'' B. All payments by or to any banking institution within the United States; * * *

'' SECTION 7. Without limitation as to any other powers or authority of the Secretary of the Treasury or the Attorney General under any other provision of this Order, the Secretary of the Treasury is authorized and empowered to prescribe from time to time regulations, rulings, and instructions to carry out the purposes of this Order and to provide therein or otherwise

the conditions under which licenses may be granted by or through such officers or agencies as the Secretary of the Treasury may designate, and the decision of the Secretary with respect to the granting, denial or other disposition of an application or license shall be final.''

Both the defendant and the plaintiff were foreign nationals under the definitions already referred to. The government, in its brief, also contends that the defendant was a '' banking institution '', under the definition set forth in section 5, subdivision F, of the Order. However, I cannot agree with this contention, and do not base my decision on it.

Even a casual reading of the Order will indicate the tremendous power which the Treasury Department was authorized to exert over the affairs of a foreign national, including this defendant, pursuant to the '' freezing control '' method. Any individual or corporation coming within the scope of this Order could not draw upon its bank accounts for a single dollar for any purpose, including the payment of salaries, without permission. Its financial transactions could be limited or prohibited altogether by conditions imposed by the Secretary of the Treasury or any officer or agency designated by him, if he deemed such limitation or prohibition was in furtherance of national defense, security or public interest. (Preamble, Executive Order No. 8785). It seems clear to me that the Secretary of the Treasury, acting through his designated Treasury representative, had ample authority to condition the defendant's continuance in business upon a severance of relationships with those individuals whom the Government believed to be improper employees. Having the power to regulate or prohibit *in toto* the financial operations of the defendant, it had the implied authority to condition the continuance of the license to do business upon its approval of the employment practices of the corporation. The license itself indicates as much, for it states: '' This license does not authorize any transaction prohibited by the Treasury representative assigned to this enterprise. No payment or transfer of credit may be made without the prior approval of such Treasury representative. No change in personnel may be effected without the prior approval of such Treasury representative.'' This authority to license on condition has been expressly sustained in the courts. (*British-American Tobacco Co.* v. *Federal Reserve Bank,* 104 F. 2d 652, mod. 105 F. 2d 935; certiorari denied 308 U. S. 600.) Under the broad powers granted by the Executive Order issued pursuant to subdivision. (b) of section 5 of the Trading with the Enemy Act, the Treasury

Department had the right to say to this defendant, " Do thus or so, or your license to operate will be revoked; terminate this or that contract or your bank account will be frozen; refuse to comply and you are subject to a fine and imprisonment ". In actual practice, the method followed was more direct. The plaintiff himself was notified that his contract was terminated. Regardless of procedure followed, however, the result is the same, and the result, the termination of the plaintiff's contract, was something which the Secretary of the Treasury had the power to bring about under the license, the Executive Order and the law.

From the papers submitted, it seems clear to me that when the Treasury representative notified the plaintiff that his services were no longer required, his act was the act of the Secretary of the Treasury, and was sanctioned by all the authority vested in the Secretary by virtue of Executive Order 8389, as amended, and subdivision (b) of section 5 of the Trading with the Enemy Act, as amended by the First War Powers Act, 1941. There was no necessity that such order be signed by the Secretary of the Treasury in person. (*Roxford Knitting Co.* v. *Moore & Tierney, Inc.*, 265 F. 177, certiorari denied 253 U. S. 498.) He had the requisite authority to terminate the contract under either method of control.

Since the Treasury representative had the authority to terminate the contract, its performance became a thing forbidden, a violation of law. In the words of FINCH, J., writing for the court in *People* v. *Globe Mut. Life Ins. Co.* (91 N. Y. 174, 179) : " What had happened was a dissolution of the contract by the sovereign power of the State, rendering performance on either side impossible."

I find no distinction in principle between the situation herein presented and that which was before the court in *Springer* v. *Garvan* (276 F. 595). In that case the plaintiff, an American citizen, prior to the first World War entered into an executory contract with a German subject. The German subject subsequently became an enemy alien and his property was seized by the Alien Property Custodian. The American citizen performed his part of the contract and sought to recover therefor from the custodian. The claim was disallowed, so far as it was based upon performance of the contract subsequent to the enactment of the Trading with the Enemy Act, which at that time made such transactions unlawful except by license of the President. Under the present Act, although commercial intercourse with foreign nationals is not absolutely forbidden, it is a matter

subject to governmental control. In the instant case the continuance of the plaintiff's contract with the defendant, a foreign national, has been forbidden. Recovery, therefore, either from the governmental agency or from the defendant itself, may not be had.

As a matter of fact there was no breach of contract as such, either by the plaintiff or by the defendant. For aught that appears, both parties were willing to continue the relationship. A higher authority, however, has intervened and made future performance by both impossible. Under such circumstances the defendant may not be held liable for the breach. (*Heine* v. *Meyer,* 61 N. Y. 171; *Adler* v. *Miles,* 69 Misc. 601; *Matter of Kramer & Uchitelle, Inc.,* 288 N. Y. 467.)

The more recent cases arising in connection with the present national emergency reach a similar conclusion and hold that where a contract, valid at its inception, is rendered unlawful by governmental decree adopted as a part of the war effort, performance is excused. (*Export Syndicate of Steel Producers* v. *Dilsizian, Inc.,* 36 N. Y. S. 2d 868, affd. 265 App. Div. 923; *Swift* v. *Hale Pontiac Sales,* 34 N. Y. S. 2d 888.)

Indeed, even if the Secretary of the Treasury lacked the authority to nullify the contract in question, the defendant would still be absolved from liability in the absence of a showing of lack of good faith. Paragraph (2) of subdivision (b) of section 5 of the Trading with the Enemy Act, as amended by title III of the First War Powers Act, 1941, specifically provides: '' and no person shall be held liable in any court for or in respect to anything done or omitted in good faith in connection with the administration of, or in pursuance of and in reliance on, this subdivision, or any rule, regulation, instruction, or direction issued thereunder.''

In accordance with the foregoing, the defendant's motion for summary judgment will be granted and the plaintiff's motion for summary judgment will be denied. In view of this disposition of the matter the plaintiff's motions to strike out various defenses for insufficiency need not be passed upon.

Submit order in accordance with the foregoing, with costs to the defendant.