**AMERICAN AIRWAYS CHARTERS, INC., Appellant**

v.

**Donald REGAN, Secretary of the Treasury, et al.**

No. 83–1860.

United States Court of Appeals, District of Columbia Circuit.

Argued March 28, 1984.

Decided Oct. 23, 1984.

Harold H. Greene, District Judge, concurred specially and filed opinion.

MacKinnon, Senior Circuit Judge, dissented in part and concurred in remand and filed opinion.

David Rudovsky, Philadelphia, Pa., with whom James E. Drew, Washington, D.C., was on the brief, for appellant.

William H. Briggs, Jr., Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellees.

Before GINSBURG, Circuit Judge, MACKINNON, Senior Circuit Judge, and HAROLD H. GREENE,* United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge GINSBURG.

Concurring opinion filed by District Judge GREENE.

Opinion dissenting in part and concurring in remand filed by Senior Circuit Judge MACKINNON.

GINSBURG, Circuit Judge:

This case concerns the right of a Florida corporation, specially designated a "Cuban national" pursuant to section 5(b) of the Trading with the Enemy Act, 50 U.S.C. app. § 5(b) (1982) (TWEA or Act), to choose and retain counsel without obtaining in advance a government (Treasury Department, Office of Foreign Assets Control) license to do so. We hold that although government permission, in the form of an Office of Foreign Assets Control license, is required prior to the execution of any transaction reaching the assets of a designated Cuban national, the Office of Foreign Assets Control lacks authority to condition the bare formation of an attorney-client

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

relationship on advance government approval.

The administrative authority asserted in this case has never been asserted on any prior occasion; the controlling legislation, were we to read it as contemplating a government license prior to obtaining counsel, would trench on a right of constitutional dimension. We therefore decide this appeal in a manner that both is consistent "with the policy of the legislation as a whole," *Shapiro v. United States*, 335 U.S. 1, 31, 68 S.Ct. 1375, 1391, 92 L.Ed. 1787 (1948) (quoting *United States v. American Trucking Associations*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940)), and avoids a constitutional inquiry. *See Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346–48, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 441, 5 L.Ed. 257 (1821).

## I.

The named plaintiff-appellant, American Airways Charters, Inc. (AAC), is a closely-held corporation, incorporated under the laws of Florida on February 15, 1977. Joint Appendix (J.A.) 15. AAC formerly provided charter service for tourist flights between the United States and Cuba. On April 7, 1982, the Treasury Department's Office of Foreign Assets Control (OFAC), acting pursuant to section 5(b) of the Trading with the Enemy Act, 50 U.S.C. app. § 5(b),[1] specially designated AAC a Cuban national. This designation, under the Cuban Assets Control Regulations (CACR), 31 C.F.R. pt. 515 (1983),[2] effectively froze or blocked all of AAC's assets.

At the time of the designation, and for over five months thereafter, AAC was represented by Allen L. Lear, a member of the bar of the District of Columbia. Lear advised AAC on OFAC's regulations, applied for licenses to carry out various transactions, and generally represented AAC in its dealings with OFAC. Lear held no OFAC license to represent AAC; he never requested OFAC's permission to represent AAC; he was never told by OFAC that his

---

**1.** Section 5(b), subject to certain exceptions, no longer applies when the nation is not at war; instead, during peacetime, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–1706 (1982), generally governs. *See* Act of Dec. 28, 1977, Pub.L. No. 95–223, § 101(a), 91 Stat. 1625, 1625. The case before us, however, falls within one of the exceptions. Under *id.* § 101(b), 91 Stat. at 1625,

> the authorities conferred upon the President by section 5(b) of the Trading With the Enemy Act, which were being exercised with respect to a country on July 1, 1977, as a result of a national emergency declared by the President before such date, may continue to be exercised with respect to such country [if the President determines it to be in the national interest].

The Cuban Assets Control Regulations, 31 C.F.R. pt. 515 (1983), promulgated by OFAC pursuant to § 5(b), remain in force under this grandfather clause. *See generally Regan v. Wald,* —— U.S. ——, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984).

OFAC does not rely in this litigation on any authority stemming from § 620(a) of the Foreign Assistance Act of 1961, 22 U.S.C. § 2370(a) (1982). *Cf. Regan v. Wald,* —— U.S. at —— n. 1, 104 S.Ct. at 3030 n. 1.

**2.** 31 C.F.R. §§ 515.302, .305, .201(d) define the terms "[Cuban] national" and "designated national" to include any person who has been a Cuban citizen, and "any person who has been within [Cuba,] whether domiciled or resident therein or otherwise," at any time on or since July 8, 1963; any organization organized under Cuban law; any organization that on or since July 8, 1963, had or has had its principal place of business in Cuba; any organization that on or since July 8, 1963, has been controlled, directly or indirectly, by Cuba or Cuban nationals; any person to the extent that that person is or has been, since July 8, 1963, acting or purporting to act directly or indirectly for the benefit of or on behalf of any Cuban national; and "[a]ny other person who there is reasonable cause to believe is a [Cuban] 'national' as defined in this section." 31 C.F.R. § 515.302(b) further provides: "The Secretary of the Treasury retains full power to determine that any person is or shall be deemed to be a 'national' within the meaning of this section . . . ."

31 C.F.R. §§ 515.306, .305, .201(d) define the term "specially designated national" to include any person who, on or since July 8, 1963, has acted for or on behalf of the Cuban government; any organization that on or since July 8, 1963, has been owned or controlled directly or indirectly by the Cuban government or by any specially designated national; and "[a]ny person who is determined by the Secretary of the Treasury to be a specially designated national."

In this proceeding, AAC does not contest its status as a "specially designated national."

representation of AAC was contingent upon application for and receipt of a license. After April 7, 1982, however, he sought and obtained licenses authorizing payment for services he rendered to AAC. *See* J.A. 34–35 (Lear affidavit); Brief for Appellees at 7 (hereafter, OFAC Brief).

Lear ceased representing AAC on September 10, 1982, when he left his law firm to commence service as a Department of Justice trial attorney. To provide for continued representation of AAC upon Lear's withdrawal as counsel, AAC's then president, Fernando Fuentes, engaged Harold A. Mayerson of the New York bar, and his law firm, Mayerson & Smith, P.C., to represent the corporation. Fuentes authorized Mayerson, on or about September 8 or 9, 1982, to be AAC's legal advocate before OFAC and for all other purposes relating to AAC's corporate status. J.A. 27 (Mayerson affidavit); *id.* at 32–33 (Fuentes affidavit); *see* OFAC Brief at 7–8. Both Fuentes, by letter dated September 13, 1982, and Mayerson, by letter dated September 15, 1982, notified OFAC that Mayerson & Smith, P.C., had been retained as AAC's counsel. J.A. 18–19. In addition, on or about September 9, 1982, Mayerson called OFAC to schedule a meeting to discuss his substitution as counsel and the orderly transfer of AAC's legal work from Lear to Mayerson & Smith, P.C. J.A. 27 (Mayerson affidavit); *see* OFAC Brief at 8.

The meeting took place on September 16, 1982, at OFAC's offices. At the meeting, OFAC's director, Dennis M. O'Connell, told Mayerson that legal representation of a "designated national" required a specific license, and that the letter Mayerson had written to OFAC was inadequate to be deemed a license request. In the absence of a proper application for and grant of a specific license, O'Connell stated, Mayerson could not represent AAC. J.A. 28–29 (Mayerson affidavit); *id.* at 71 (O'Connell affidavit); *see* OFAC Brief at 8. OFAC did not supply to, or identify for, Mayerson the application form to which its director referred. Nor, in response to Mayerson's inquiries, did OFAC officers cite any prior instance in which OFAC had in fact conditioned counsel's mere representation of a "designated national" on an advance application for and grant of a government license. J.A. 28–29 (Mayerson affidavit).[3]

On September 17, 1982, the day following Mayerson's meeting with OFAC officials, OFAC's director notified Fuentes, by letter, that he was henceforth "prohibited from engaging in any transactions for, on behalf of, or with [AAC], without a specific license from this Office." J.A. 20. The letter stated that the prohibitions would "prevent [Fuentes] from functioning as the president and chief executive officer of AAC." *Id.* It further stated that the director ordered the prohibitions "in the interests of conserving and liquidating AAC's assets and the proper settlement of its accounts," and in view of the "a) control of AAC by Cuba or Cuban nationals while [Fuentes was] its president and chief executive officer, b) the transfer out of the U.S. of AAC assets on the day AAC was designated as a Cuban national, and c)

---

**3.** In an affidavit supporting defendants' motion for summary judgment in the district court, OFAC's director characterized as "gross overstatement" the plaintiff's contention "that this is the first time in which OFAC has ever sought to require a foreign national to obtain a license to retain counsel." J.A. 76; *see also* OFAC Brief at 27 (repeating the "overstatement" characterization).

Several members of the bar experienced in representing clients before OFAC presented affidavits to the district court fully consistent with the description of OFAC's position here as an unheralded, radical departure from prior practice. These affidavits inform that attorneys for designated nationals did obtain licenses *for pay-* ment of legal fees, but had never known or heard of any case, prior to this one, in which OFAC conditioned *mere representation* of a designated national on an advance application for and grant of a license. *See* J.A. 29 (Mayerson affidavit); *id.* at 35 (Lear affidavit); *id.* at 36–37 (Rabinowitz affidavit); *id.* at 38–39 (Faulkner affidavit). OFAC, in face of these affidavits, did not call to the district court's attention any past occasion on which OFAC had announced or proposed that a designated national must seek and receive a license *before* obtaining legal representation. Nor has OFAC contended in this court that it has, at any time prior to the episode in suit, asserted that representation, without more, requires a license.

[Fuentes'] indictment for violations of the Trading With the Enemy Act." *Id.*

Thereafter, OFAC chose to recognize and deal with Frank Masdeu, one of AAC's two then vice-presidents, as the sole individual authorized to act on behalf of AAC. *See* J.A. 31 (Fuentes affidavit); *id.* at 76 (O'Connell affidavit). OFAC has advised Masdeu that he has the right to select counsel for AAC and to apply for a license for the retention of such counsel. J.A. 68 (Masdeu affidavit); *id.* at 76 (O'Connell affidavit). There is no indication in the record that OFAC ever consulted Florida law when it determined that Masdeu, and no other person, may properly speak for AAC. Nor is there any indication that Masdeu, on OFAC's recommendation or on his own initiative, ever attempted to secure a Florida court determination that he is currently the proper spokesman for AAC.

The instant action, seeking injunctive and declaratory relief allowing Mayerson to represent AAC, was commenced on November 3, 1982. Both sides filed dispositive motions. On July 11, 1983, the district court dismissed the complaint for want of subject matter jurisdiction. *American Airways Charters, Inc. v. Regan*, Civ. No. 82–3143 (D.D.C. July 11, 1983), *reprinted*

*in* J.A. 4–8. The district judge reasoned that on April 7, 1982, the day AAC was designated a foreign national, the corporation lost capacity to act; since that day, the court declared, AAC has "lack[ed] the capacity to retain counsel to bring this action in its own name." J.A. 5.[4] OFAC, according to the district court, "has plenary authority to control [AAC's] operation." J.A. 7 n. 4. Thus, the district court apparently concluded, without OFAC's license, no attorney may prosecute this suit as AAC's agent.[5] *But cf. Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d 355 (11th Cir. 1984) (Cuban national need not obtain a license prior to initiating an in personam lawsuit in a United States court).

■ We think the district court stumbled in attributing to OFAC more power than Congress conferred upon the Executive. AAC's assets are blocked, and may not be touched without OFAC's permission. But Congress has not authorized the Executive to seize the corporation, control all its internal operations, decide—with no regard to state law—who shall act as its president in lieu of the board-elected officer,[6] and impose a prior license requirement before the corporation can designate an attorney to represent it.

---

4. The district court compared AAC, once it was designated a Cuban national, to a principal incapacitated by death or insanity. J.A. 7.

5. We note the Catch-22 quality of this reasoning: the named plaintiff's incapacity to "prosecut[e] ... this suit by counsel," J.A. 7, the district court essentially held, can be overcome only if the named defendants grant a license "authoriz[ing] the[ir] prosecution." *Id. See also infra* note 15 and accompanying text.

In this court, OFAC has elaborated on the district court's terse disposition. OFAC asserts that no case or controversy exists because suit was not properly authorized by AAC. According to OFAC, neither AAC's authorization (through Fuentes) of Mayerson on or about Sept. 9 to "take any and all actions necessary to represent [AAC] and to protect [its] rights and interests with respect to OFAC or any other legal matter," J.A. 32–33, *see* OFAC Brief at 14, nor any actions that were or could have been taken at a subsequent meeting, styled a Special Meeting in lieu of Annual Meeting of Shareholders, of Fuentes and Roger Dooley (AAC's sole shareholders), constituted valid authorization

for the litigation. OFAC points out that Frank Masdeu, the person it recognizes as sole "spokesman" for AAC, OFAC Brief at 20, did not request Mayerson to commence this civil proceeding. Masdeu is a vice-president of AAC but, unlike Fuentes and Dooley, he holds no shares in the company.

We need not address the particulars of OFAC's "no case or controversy" contention. This suit, given the facts not in dispute, *see infra* p. 870, received adequate and appropriate "sanction of the directors or other proper officer." 2 FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 483 (1982). Under Florida law, the president of a corporation has authority to engage the services of counsel and institute suits on the corporation's behalf. *See Conlee Constr. Co. v. Cay Constr. Co.*, 221 So.2d 792, 795 (Fla. Dist.Ct.App.1969).

6. No contest has been raised in this proceeding concerning OFAC's decision prohibiting Fuentes, on and after September 17, 1982, from "engaging in any transactions for, on behalf of, or with [AAC], without a specific license from [OFAC]." J.A. 20.

Facts not in dispute reveal that in early September 1982, when Fuentes authorized Mayerson to represent AAC, Fuentes was AAC's president and chief executive officer. Nor is it seriously disputed that, absent a valid prior license requirement, AAC's president would have authority to obtain counsel for the corporation. Because we conclude that Congress did not commit to the Executive power to condition a designated Cuban national's bare representation by counsel upon advance government approval, we reverse the district court's judgment and remand the case with directions to enter appropriate relief for AAC.[7]

## II.

Section 5(b) of TWEA confers upon the President authority to control, through any agency he designates, "transactions in foreign exchange"; "transfers of credit or payments between, by, through, or to any banking institution"; "the importing, exporting, hoarding, melting, or earmarking of gold or silver coin or bullion, currency or securities"; and finally "any ... transactions involving [ ] any property in which any foreign country or a national thereof

has any interest." 50 U.S.C. app. § 5(b)(1) (1982). The CACR prohibitions track this TWEA language. *See* 31 C.F.R. § 515.201 (1983).

First enacted in 1917 as a wartime measure, TWEA "evince[d] the purpose to clothe the President with definitely restricted powers in respect of seizing property of those designated as enemies." *Behn, Meyer & Co. v. Miller*, 266 U.S. 457, 462, 45 S.Ct. 165, 165, 69 L.Ed. 374 (1925). The drafters of the original Act described it as designed

> to mitigate the rules of law which prohibit all intercourse between the citizens of warring nations, and to permit, under careful safeguards and restrictions, certain kinds of business to be carried on. It also provides for the care and administration of the property and property rights of enemies and their allies in this country pending the war.

S.REP. No. 113, 65th Cong., 1st Sess. 1 (1917), *quoted in Markham v. Cabell*, 326 U.S. 404, 414 n. 1, 66 S.Ct. 193, 198 n. 1, 90 L.Ed. 165 (1945) (Burton, J., concurring). The Act, as amended to extend to peacetime national emergencies, OFAC points

---

**7.** OFAC additionally maintained on brief and at oral argument that AAC's suit should be dismissed because the company had not exhausted its administrative remedies by filing a formal license request, or having one filed by Mayerson. That position is no longer tenable. Upon consideration of the representation of Dennis O'Connell, OFAC's director, that OFAC was "prepared to act quickly on any application AAC may wish to make to hire the counsel of its choice," and the indication of OFAC's counsel at oral argument that the agency would give prompt consideration to a filing by counsel relating to AAC's retention of Mayerson, we instructed Mayerson to file

> a [formal] application with OFAC ... to confirm his representation of appellant American Airways Charters, Inc., pursuant to the September 1982 exchange of correspondence between Mr. Fuentes, Mr. Mayerson, and Mr. O'Connell ..., and to confirm his representation of appellant in the instant litigation for a declaration of appellant's right to retain counsel of its choice.

We further stated:

> This instruction is without prejudice to the position advanced by Mr. Mayerson that the relevant federal law does not mandate, and

the Constitution forbids, a requirement of OFAC licensing for the retention of counsel by a designated national.

*American Airways Charters, Inc. v. Regan*, No. 83–1860 (D.C.Cir. Mar. 29, 1984). Our order directed OFAC to act expeditiously on Mayerson's filing.

OFAC, in response to Mayerson's filing, issued him a document it styled a "conditional license." *See* Motion for Remand at 1. The license, OFAC informed Mayerson, would become effective only upon his submission to the agency of satisfactory evidence that Frank Masdeu, the person OFAC regards as sole "spokesman" for AAC, *see supra* p. 869 & note 5, had engaged his services on behalf of AAC. In addition, OFAC required Mayerson to answer a number of questions assertedly directed to whether representation of AAC by Mayerson might lead to a conflict of interest. OFAC subsequently informed Mayerson that "you have not met the conditions spelled out in the license" because "you have provided no indication that Mr. Masdeu seeks your services for AAC." Letter from Dennis M. O'Connell, Director of OFAC, to Harold A. Mayerson (May 7, 1984).

out, serves three principal foreign policy purposes: It "prevent[s] [designated countries] from receiving any economic benefit from transactions with persons subject to the jurisdiction of the United States"; it "limit[s] the flow of currency to specified hostile nations"; and it "den[ies] [designated countries] outlet[s] for [their] goods in the United States market." OFAC Brief at 5–6 (quoting Malloy, *Embargo Programs of the United States Treasury Department*, 20 COLUM.J. TRANSNAT'L L. 485, 487–88 (1981)).[8]

In asserting authority to control a designated foreign national's formation of an attorney-client relationship, OFAC relies dominantly on the TWEA power, carried over into the CACR, to license transactions involving "property in which any foreign ... national ... has any interest." Fuentes' purported retention of Mayerson as counsel for AAC on or about September 9, 1982, OFAC maintains, can only be viewed as an attempt to contract for services. Any contract, as OFAC reads the CACR and TWEA, constitutes a "transfer" of AAC's "property," and therefore cannot be consummated absent OFAC's advance permission. *See* OFAC Brief at 25–26.

The Act's catch-all reference to "property," on which the agency relies, was added to TWEA when the statute was rewritten in 1941.[9] The addition did not attract large attention, and congressional intent regarding its scope is less than crystalline.[10] Congress recognized generally that the legislation enacted in 1941 concentrated "extraordinary" war powers in the President. *See, e.g.*, 87 CONG.REC. 9858 (1941) (statement of Rep. Sumners, chairman, House Judiciary Committee). Certain aspects of the section 5(b) amendments—matters not in question here—occasioned substantial debate, most notably, whether section 5(b) could or should be read to impose government control over property owned by persons not "alien enemies." *Id.* at 9859; *see id.* at 9861 (concern of many Congress members that the Act clearly reflect "the intention of the [Judiciary] committee ... to deal only with foreign property"). It seems safe to say, however, that Congress, immediately concerned with other issues and more obvious forms of property, never explicitly contemplated the specific application of TWEA authority first announced by OFAC when OFAC told Mayerson that his substitution for Lear as AAC's counsel could not be accomplished without government license.

■ We have no occasion in this case to address the claim implicit in plaintiff's brief, *see* Brief for Appellant at 9, that the Act and regulations thereunder should never be read to cover the formation of executory contracts, absent any actual transfer of assets. Nor does the matter at hand involve any contest whether AAC was properly designated a "Cuban national," or whether its holdings are properly considered Cuban property. We limit our inquiry to the sole question properly before us for review: Does the bare formation of an attorney-client relationship lie outside

---

**8.** *But see supra* note 1.

**9.** Prior to 1941, the Act extended to the President authority limited to

transactions in foreign exchange, transfers of credit between or payments by or to banking institutions ... and export, hoarding, melting, or earmarking of gold or silver coin or bullion or currency, and any transfer, withdrawal or exportation of, or dealing in, any evidences of indebtedness or evidences of ownership of property in which any foreign state or a national ... thereof ... has any interest.

*See* Act of May 7, 1940, ch. 185, § 1, 54 Stat. 179, 179.

**10.** Some members of Congress stated that the Act as amended was intended to cover "all kinds of real and personal property belonging to aliens." 87 CONG.REC. 9861 (1941) (statement of Rep. Hancock); *see also id.* at 9863 (statement of Rep. Gwynne) ("this provision covers all property belonging to aliens that is within our jurisdiction"). That view, however, apparently was not deemed inconsistent with statements that "[s]ubsection (b) [in relevant part] is the same as the old law." *Id.* at 9865 (statement of Rep. Kefauver); *see also id.* at 9859. The old law's coverage, *see supra* note 9, did not on its face extend beyond foreign exchange transactions, banking transactions, and dealings in gold, silver, currency, and "evidences of indebtedness or evidences of ownership of property."

the reach of the Act and its implementing regulations? In deciding that question in plaintiff's favor, we are guided by the reminder in *Real v. Simon*, 510 F.2d 557, 564 (5th Cir.1975), that interpretation of TWEA terms must "have the support of the congressional policies behind the Act," and by the due process concerns implicated in the asserted right to choose counsel without interference by officialdom.

▆▆▆ It is doubtful whether any of the exclusively economic purposes, *see generally Regan v. Wald*, — U.S. —, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984), legitimately served by the Act would be advanced by upholding OFAC's novel position. If AAC is allowed to retain—although not to pay—counsel without government license, Cuba will not thereby receive economic benefit from transactions with persons subject to the jurisdiction of the United States; the goal of limiting the flow of currency to Cuba will remain unimpaired; and Cuba will not gain any outlet for its goods in the United States market. *See supra* p. 871. OFAC asserts an interest in preserving the blocked assets of AAC against improper

disposition by Mayerson, or exorbitant claims asserted by him.[11] But counsel for a designated national has no authority to dispose of the designated national's assets; and no fee can be paid counsel absent a separate, and express, authorization from OFAC. At one point in this litigation, OFAC indicated a desire to protect AAC from the baleful effects of a conflict of interest on Mayerson's part. *See supra* note 7. The disqualification of counsel for a conflict of interest, however, is a function generally entrusted to the judiciary,[12] not to an executive agency that is, in significant respects, the adverse party. An interpretation of TWEA and the CACR with an eye to "the congressional policies behind the Act," in short, offers scant support for OFAC's newly-minted claim of authority to preview, and then permit or restrain, a designated national's choice of counsel.

The nature and purpose of the attorney-client relationship, moreover, impel us to review with special care any initiative by an administrative officer to expose to licensing the very creation of that relationship.[13] We stress particularly that, in our complex, highly adversarial legal system,

---

**11.** *Cf. Real v. Simon*, 510 F.2d at 563 (government asserted interest in "retain[ing] blocked funds for possible use or vesting to the United States should such a decision be made[,] and ... [in] us[ing] blocked funds for negotiation purposes in discussions with the Cuban government"; argument rejected, on ground that claimants to blocked fund were United States nationals and "it is not the intent of this country to use the property of one group of Americans to provide compensation to another group").

**12.** *Cf. Groper v. Taff*, 717 F.2d 1415, 1418 (D.C. Cir.1983) ("the district court bears responsibility for supervising the members of its bar [for conflict of interest] and its exercise of this supervisory duty is discretionary").

**13.** We would face a different case if Congress itself inaugurated the prior license requirement. We note that in 1938, Congress passed the Foreign Agents Registration Act, ch. 327, 52 Stat. 631 (1938) (codified as amended at 22 U.S.C. §§ 611–621 (1982)), requiring agents of foreign principals to register with the Secretary of State. This Act requires *registration only;* it confers on the Secretary no authority to deny a registrant permission to act on behalf of the foreign principal. Initially, the legislation contained no explicit exemption for lawyers, and the Supreme

Court refused to read such an exemption into the Act. *Rabinowitz v. Kennedy*, 376 U.S. 605, 84 S.Ct. 919, 11 L.Ed.2d 940 (1964) (attorneys representing Republic of Cuba required to register).

Although the Foreign Agents Registration Act serves only a notice, not a licensing function, Congress has indicated sensitivity to the lawyer's role. After the decision in *Rabinowitz v. Kennedy*, Congress amended the statute to exempt lawyers insofar as they engaged or agreed to engage in the legal representation of a disclosed foreign principal before a court of law or in the course of established agency proceedings. Act of July 4, 1966, Pub.L. No. 89–486, § 3(b), 80 Stat. 244, 246 (codified at 22 U.S.C. § 613(g) (1982)). Congress further amended a separate section of the Act to ensure that attorneys engaging in "routine ... advising and counseling [of] foreign clients" would be exempt. *See* H.R. REP. No. 1470, 89th Cong., 2d Sess. 9–10, *reprinted in* 1966 U.S.Code Cong. & Ad.News 2397, 2405. This congressional action, when only registration was at stake, adds to our grave doubts that Congress ever entertained the notion that an executive officer might extract from highly general statutory language authority to initiate a prior license requirement governing an attorney's response to a client's request for representation.

an individual or entity may in fact be denied the most fundamental elements of justice without prompt access to counsel. As this court observed in *Martin v. Lauer*, 686 F.2d 24 (D.C.Cir.1982): "[W]hile private parties must ordinarily pay their own legal fees, *they have an undeniable right to retain counsel to ascertain their legal rights.*" *Id.* at 32 (emphasis added; footnote omitted).

The invalidity of a governmental attempt to deny counsel to a civil litigant was recognized in dictum over fifty years ago in *Powell v. Alabama*, 287 U.S. 45, 68–69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932):

> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. . . . If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense.

More recent decisions have elaborated on the same basic theme. *See, e.g., Goldberg v. Kelly*, 397 U.S. 254, 270, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970) (AFDC recipient "must be allowed to retain an attorney [in benefits termination hearing] if he so desires"); *Mosley v. St. Louis Southwestern Railway*, 634 F.2d 942, 945 (5th Cir.) ("The right to the advice and assistance of retained counsel in civil litigation is implicit in the concept of due process, and extends to administrative, as well as courtroom,

proceedings.") (citation omitted), *cert. denied*, 452 U.S. 906, 101 S.Ct. 3032, 69 L.Ed.2d 407 (1981); *see also United Mine Workers, District 12 v. Illinois State Bar Association*, 389 U.S. 217, 221–22, 88 S.Ct. 353, 355–56, 19 L.Ed.2d 426 (1967) (striking down, on first amendment grounds, state rule barring union from hiring attorney to assist its members in the assertion of their legal rights).[14]

We place against this backdrop OFAC's assertion of power to stop AAC from obtaining counsel unless and until the government licenses the corporation to do so. Even in the absence of a marked constitutional dimension to the problem, sensible construction of the Act would not encompass OFAC's current, unprecedented, reading of highly general clauses. The agency, we believe, has gone beyond mere interpretation. It has effectively legislated in an area in which our tradition indicates the lawmakers themselves—Congress—should speak with a clear voice in advance of administrative action.

When we add to our consideration the constitutional dimension plaintiff's access-to-counsel plea entails, we find the case against OFAC's position overwhelming. As OFAC would have it, once an entity, although incorporated in the United States, has been administratively designated a foreign national, and therefore placed under government control regarding commercial matters, the designated corporation can be subjected to the decision of a government office, bounded by no standards that have been presented to us, even as to the very

---

**14.** It appears beyond sensible debate that corporations, in our society, do indeed enjoy the right to retain counsel. Corporations may not assert "purely personal" rights but, no less than natural persons, they are entitled to due process and the equal protection of the laws. *Grosjean v. American Press Co.*, 297 U.S. 233, 244, 56 S.Ct. 444, 446, 80 L.Ed. 660 (1936). As our sister court observed, "the right to effective assistance of counsel is not so peculiarly applicable to individuals that corporations should not be entitled to it." *United States v. Rad-O-Lite of Philadelphia, Inc.*, 612 F.2d 740, 743 (3d Cir.1979). In fact, denying a corporation the right to retain counsel may be tantamount to stripping the corporation of its right to defend itself in court, for "it is established that a corporation, which is

an artificial entity that can only act through agents, cannot proceed *pro se.*" *Jones v. Niagara Frontier Transp. Auth.*, 722 F.2d 20, 22 (2d Cir.1983). A human shareholder's right to representation, of course, does not obviate the need for counsel to the corporation. No shareholder—not even a sole shareholder—has standing in the usual case to bring suit in his individual capacity on a claim that belongs to the corporation. *See, e.g., Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 439–40 (9th Cir.1979); *see also, e.g., Blum v. Morgan Guar. Trust Co.*, 539 F.2d 1388, 1390 (5th Cir.1976) (individual shareholder will not be permitted to sue *derivatively* on the corporation's behalf if court concludes that conflict of interest prevents him from serving as an appropriate representative).

question whether the corporation can meaningfully challenge the designation through counsel.[15] We reject that bold view. Instead, we construe the Act and regulations thereunder "in a manner that not only upholds their constitutionality but also steers clear of uncertainty on that score." *Kelsey v. Weinberger*, 498 F.2d 701, 708 (D.C.Cir.1974) (footnote omitted); *see also Tagle v. Regan*, 643 F.2d 1058, 1067 (5th Cir.1981) (construing TWEA).[16] *See generally NLRB v. Catholic Bishop*, 440 U.S. 490, 500–01, 99 S.Ct. 1313, 1318–19, 59 L.Ed.2d 533 (1979) (courts should prefer plausible construction of statute that avoids "serious constitutional questions" to agency's construction raising such questions, unless agency's position reflects "the affirmative intention of the Congress clearly expressed").[17]

### III.

We thus conclude that Mayerson was properly retained by AAC as its counsel on or about September 9, 1982. No termination of that relationship by a person speaking for AAC is reflected in the materials supplied to us; the relationship thus continues in effect.[18] At such time as a person with authority to speak for AAC terminates the relationship, it will come to an end.

To clarify and summarize our disposition, we add these closing remarks. TWEA, as implemented by the CACR, gives OFAC authority to control, in almost every respect, AAC's commercial relations with the outside world. AAC does not argue otherwise. *See* Brief for Appellant at 16. OFAC's power, however, extends only to the freezing or blocking of AAC's assets and the licensing of its transactions; OFAC has no authority to seize the corporation itself, to vest its assets,[19] or—beyond the power it has over employment contracts

**15.** If OFAC is correct, AAC would also be precluded from litigating in the Florida courts any issues relating to its corporate existence, including the identity of its lawful spokesman.

**16.** OFAC maintains that plaintiff's effort to implicate constitutional concerns is "no different," OFAC Brief at 25, from the first amendment argument rejected in *Veterans & Reservists for Peace in Vietnam v. Regional Comm'r of Customs*, 459 F.2d 676 (3d Cir.), *cert. denied*, 409 U.S. 933, 93 S.Ct. 232, 34 L.Ed.2d 188 (1972). In *Veterans & Reservists*, the Third Circuit upheld OFAC's requirement that plaintiff secure a license before receiving "Red Chinese literature," *id.* at 679, in the form of English-language newspapers mailed from North Vietnam. The court found the government's interest in regulating the flow of money to designated countries compelling, *id.* at 682, and indicated that requesters would be entitled to a license upon certifying that they did not intend to pay for the materials, either directly or indirectly. *Id.* at 683. The merits of the *Veterans & Reservists* decision are not before us. We note, however, that the government concern asserted in that case was the threat of transfer of currency to North Vietnam and (at the time of the seizure still subject to our embargo) the People's Republic of China, a concern at the heart of the Act. In this case, OFAC identifies no interest of comparable dimension that reasonably supports its actions.

**17.** Even if OFAC's view of the law did not implicate constitutional concerns, the agency's insistence that we owe its construction deference would be dubious. Far from representing a consistent, longstanding agency interpretation, OFAC's current position apparently represents a sharp departure from prior practice, *see supra* note 3, first made public as a result of the events that precipitated this lawsuit, and explained, so far as the record shows, only in briefs and other papers generated by the litigation. *See Tagle v. Regan*, 643 F.2d at 1068 n. 13 ("[T]he Treasury's interpretation of its authority [under TWEA] is neither contemporaneous with the statute's enactment, nor consistent with its earlier views. These facts considerably reduce the deference paid to its current position ....").

**18.** Counsel for OFAC stated at oral argument that even if an attorney-client relationship was formed on September 9, it was extinguished one week later, when OFAC barred Fuentes from engaging in further transactions on behalf of AAC. The attorney-client relationship lapsed, counsel argued, when Fuentes became disabled.

OFAC's portrayal of agency law is novel indeed. When OFAC barred Fuentes, *his* ability to serve as AAC's agent ended; but we do not comprehend how that act served as well to terminate the pre-existing, ongoing agency relationship between AAC and Mayerson. *See generally* RESTATEMENT (SECOND) OF AGENCY § 121 comment c, illustration 2 (1957).

**19.** The war powers granted to the President under the 1941 amendments to the Act did include the power to "vest" assets of foreign nationals. *See Silesian-American Corp. v. Clark*,

entered into by AAC—to rearrange its internal affairs.[20]

■ OFAC has undisputed power to deny AAC permission to engage in specified commercial transactions. We caution here that nothing in our disposition is properly read as authorizing payment to counsel without the approval of OFAC. But OFAC may not, to give an extreme example, take a member of its own staff and, without regard to AAC's corporate structure, install that person as AAC's new chief executive officer, thereby controlling AAC's operations from the inside. If it could, then the entire CACR licensing scheme, predicated on *external* control, would be superfluous as applied to corporations.

■ State law, beyond question, is preempted when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). But OFAC has not demonstrated why it is insufficient to control, through licensing, all transactions reaching the assets of AAC, a Florida-chartered corporation now designated a Cuban national, or how taking the corporation over from the inside, incidentally eliminating any genuine possibility of judicial review at the corporation's behest, furthers the balancing of interests embodied in the congressional external control scheme. The internal structure of a desig-

nated national corporation remains properly governed by state law, not by agency fiat, in the absence of a concrete showing that state law in fact conflicts with federal purposes and objectives.

■ OFAC has repeatedly taken the position that it recognizes only Frank Masdeu as having any authority to speak for AAC, or to request any license on the company's behalf. We express no opinion as to whether Masdeu, or anyone else, may properly speak for the company. We emphasize, however, that questions of AAC's internal structure, and of who may speak for AAC when certain of its officers have been incapacitated by OFAC or by other federal action, are questions properly referred in the first instance to state law. Thus Florida law is the appropriate initial reference in determining who has authority to terminate the relationship between AAC and Mayerson or to hire other counsel.

### IV.

In enforcing section 5(b) of TWEA, OFAC must seek resolution of "the paradox posed by the need for emergency power in a constitutional regime." Note, *The International Emergency Economic Powers Act: A Congressional Attempt to Control Presidential Emergency Power*, 96 Harv.L.Rev. 1102, 1112 (1983). We are a constitutional regime in which even emergency power is subject to limitations under

---

332 U.S. 469, 474–77, 68 S.Ct. 179, 181–82, 92 L.Ed. 81 (1947) (upholding as constitutional, under war power, federal government's vesting under § 5(b) of stock beneficially owned by German national). However, OFAC does not purport to exercise that power under the CACR.

**20.** OFAC cites *Alexewicz v. General Aniline & Film Corp.*, 181 Misc. 181, 43 N.Y.S.2d 713 (Sup.Ct. Broome Cnty.1943), as authority for the proposition that AAC's state-law-prescribed internal corporate structure must "g[i]ve way in the face of TWEA's broad grant of foreign policy powers." OFAC Brief at 20. The *General Aniline* court, however, held only that the Treasury Department had authority, during the Second World War when the executive power in question reached its height, to order the termination of an employment contract between a German national corporation and plaintiff, an

industrial chemist. We do not touch that holding here. Nor do we wrench language from the *General Aniline* decision out of context and transpose it to the different time and regulatory setting of this case.

Other cases relied on by OFAC for its pronouncement that "state corporate law cannot justify a result contrary to ... the federal policies and purposes served by [TWEA]," OFAC Brief at 20, are similarly unhelpful. In *Nielsen v. Secretary of the Treasury*, 424 F.2d 833 (D.C. Cir.1970), the court relied upon the formal corporate structure of the entity in question and refused to pierce the corporate veil on behalf of the plaintiff shareholders. *Sardino v. Federal Reserve Bank*, 361 F.2d 106 (2d Cir.), *cert. denied*, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966), stands simply for the proposition that OFAC has power, pursuant to the CACR, to freeze the bank account of a Cuban national.

our highest law. OFAC's unprecedented action in this case has disturbing implications. The government agency charged with control over a corporation's external transactions, and the distribution of any of its assets, appears here to seek as well to stifle any voice the corporation might wish to raise before the courts in protest. We doubt that such an attempt is "worthy of our great government." *Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir.1970). We find no congressional authorization for it.

For the reasons stated, the judgment of the district court is reversed and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

HAROLD H. GREENE, District Judge (concurring):

The Office of Foreign Assets Control (OFAC), a minor Treasury Department bureau, has decided that, because it had listed appellant as a Cuban national, it also had the authority to prevent that corporation from being represented by counsel. This decision, if upheld, would have the effect of precluding appellant, through counsel, from contesting OFAC's actions either administratively or in the courts, from litigating in the Florida courts OFAC's decision to recognize its chosen individual as the official head of the corporation, or from handling any other legal business. This assertion of authority is unprecedented in the annals of the Trading with the Enemy Act or any other law to which we have been referred.[1] I agree entirely with Judge Ginsburg's analysis of the applicable law as not permitting such an exercise of power, and I also agree with her that, were

OFAC's position sustained, the implications would be both far-reaching and dangerous. Whatever authority our society may have granted to government, it has always placed a high value on the ability of those at the receiving end of bureaucratic edicts to contest in the courts the legality of what was done to them.

The Catch-22 label from Joseph Heller's book of the same name has been applied so often to so many situations that it has by now acquired the status of a cliché. But it is difficult to imagine a situation where that label is more apt: a corporation is summarily designated by a governmental agency as a "Cuban national," but it is not allowed effectively to defend itself against that designation on the theory that, because it is a "Cuban national," the designating agency need not permit it to be represented by counsel to challenge the designation.[2] If there are precedents in American law to such circular processes, they have not been pointed out to us.

Two basic points made in support of OFAC's position deserve further note.

First, OFAC has informed the Court that some of those involved in the management of the corporation were engaged in improper or even unlawful activities involving Cuba. But that is hardly a reason for depriving that corporation of the right to choose and retain counsel. We do not deny counsel to murderers or to rapists, to those accused or convicted of treason or espionage, or to those who sue the government to seek access to sensitive national security documents, to cite but a few examples, and I therefore see no basis for depriving this appellant of its retained counsel because

---

1. It may be—although this has not been shown—that equivalent authority was exercised during the period when the government had statutory power to "vest," that is to take over, German or other enemy assets during World War I and World War II—a power which OFAC itself does not claim to possess now. The one substantive decision relied upon in this regard by the dissent—*Alexewicz v. General Aniline & Film Corp.*, 181 Misc. 181, 43 N.Y.S.2d 713 (Sup. Ct.1943)—was rendered at the height of World War II, when the vesting provisions were in effect. In any event, unlike the dissent (at p.

877), I have difficulty regarding congressional inaction in the face of a decision by a court in Broome County as acquiescence in its holding.

2. There is here yet another Catch-22 bootstrap. OFAC first unilaterally selected appellant's vice president as the corporation's single authorized spokesman; OFAC then concluded that, inasmuch as this chosen instrument did not request legal representation, it was established that the corporation did not desire counsel.

some of its officers may be unsavory. Whatever the corporation and its officers may be, they surely do not represent such a menace to this country—in excess of the danger presented by those in the categories enumerated above—that the corporation must be so singled out. If the claims appellant may wish to assert before the administrative agency or in the courts are without validity, that will become apparent soon enough, whether or not counsel continues to represent it; if appellant does have valid claims, it should be allowed to present them in an effective manner, irrespective of the backgrounds or histories of its officers.

Second, OFAC contends that, if appellant is allowed to be represented by its previously retained counsel, the next step will be, to require counsel to be paid, in violation of the freezing regulations. Insofar as I am concerned, there is nothing in our disposition of this case that would give counsel any claim to payment if such payment is prohibited by the appropriate regulations. Thus, I do not share OFAC's concern about appellant's lawyer or the issue of his payment. If that attorney wants to proceed with his representation on what may turn out to be a volunteer basis, well and good. But this Court has not by its decision created for him a means for securing a fee.

The dissent would return the case to the District Court [3] to explore issues relating to Florida law [4] and to the exhaustion of administrative remedies. But there are neither new facts nor Florida legal principles for the District Court to consider. Moreover, OFAC made it clear both initially and after our inquiry following oral argument that it had no intention of granting a li-

cense to appellant which would enable the corporation to continue to employ counsel.[5] Whatever powers the Treasury may have— and I agree that they are extensive—they do not include the power to deny a designated individual or corporation the right to hire counsel, let alone the power to cut off an attorney-client relationship previously established.

With these additional observations, I concur fully in Judge Ginsburg's opinion for the Court and in the disposition of the appeal made by that opinion.

MACKINNON, Senior Circuit Judge (dissenting in part and concurring in remand):

In my opinion, this case should be remanded to the district court to determine whether or not a case or controversy exists. That court has not been allowed to evaluate the latest developments in the case, and should be permitted to consider, in the first instance, a variety of issues which are far from clear on this record and which undermine the majority's attempt to reach the merits of the case. I do not join the majority's opinion, which relies on a record that contains far more questions than answers and which signficantly impairs the ability of the Government to supervise and control the business activities of Cuban entities within the United States.

### I.

First, some facts which are not noted in the majority's opinion place the actions of the Office of Foreign Assets Control (the "Control Office") in a more reasonable light than does the majority's opinion. This is not, as the majority implies, a case

---

**3.** The District Court would be required to determine whether Florida law might not conceivably (1) regard appellant's vice president rather than its president as that body's proper spokesman, and (2) require ratification by the shareholders of the retention of counsel by appellant's president and of the instant lawsuit. Since appellant through its president retained counsel before OFAC imposed any license requirement on appellant and since Florida law permits the president of a corporation to retain counsel (see note 5 of Judge Ginsburg's opinion), there is no basis for inquiring into these

negatives—certainly not at the behest of a stranger to the corporation such as OFAC.

**4.** OFAC, however, regards Florida law as irrelevant, arguing that under the Trading with the Enemy Act and the Constitution's Supremacy Clause, its decisions override state law.

**5.** As early as September 17, 1982, OFAC informed appellant that "[w]e have no plans to issue new specific licenses to you." J.A. 20.

where some hapless corporation finds itself caught in the coils of a Kafkaesque bureaucracy that is systematically attempting to deprive it of its rights. It is, in fact, a case where the Government is questioning the continuing validity of an alleged employment contract under which an admittedly Cuban-controlled corporation may be charged $100 an hour in legal fees—for no specified corporate purpose—thus using up limited corporate assets that are needed to pay off the corporation's creditors.

It is undisputed at this point that Cuba controlled American Airways Charters, Inc. ("Airways"), a Florida corporation. That designation has never been challenged, and is not being challenged in this litigation. Airways' president and co-owner, Fernando Fuentes, already has been convicted of violating the Trading With the Enemy Act ("the Act"), for allowing assets of Airways to come into Cuban hands *after* it had been determined to be a Cuban national. His criminal conviction is not being challenged here. Fuentes' partner in Airways, Roger Dooley, was also indicted, and is now a fugitive from justice outside the United States. The present validity of an "open-ended" employment contract which it is claimed was entered into by Fuentes, *after* the corporation came under the jurisdiction of the Control Office, is an open question.

On April 7, 1982, Airways was designated by the Control Office as a "specially designated national" of Cuba (J.A. 15–16, 69).[1] Thereafter, on the same day, Fuentes ordered one of Airways' planes to be flown on an *unscheduled* flight to Cuba. Affidavit of Dennis M. O'Connell, Director of Office of Foreign Assets Control (J.A. 72–74).[2] The plane and other assets remaining in Cuba amount to about $375,000. That flight, made in defiance of American law, deprived the United States of a valuable asset that may be necessary to pay creditors of Airways. The Government, as the majority concedes, has a valid interest in preventing United States property from coming into Cuban hands.

The specific events leading to this section began on or about September 8, 1982, when Fuentes (according to his affidavit) informed a lawyer, Harold Mayerson, that he wanted him to represent Airways. This was five months after Airways had been designated as a Cuban national. At a subsequent conference with representatives of the Control Office on September 16, 1982, Mayerson presented two letters: one from Fuentes (dated September 13) and one from Mayerson (dated September 15). Both letters notified the Control Office that Mayerson had been retained to act as counsel to Airways. The Control Office advised Mayerson that a formal application was necessary under the Act and its implementing regulations. Mayerson *refused* to make formal application for a license. He later brought this action in Airways' name in the district court. The court dismissed the action for lack of a case or controversy. Mayerson appealed.

After argument on appeal, this court ordered Mayerson to apply for a license. He did so. The Control Office replied promptly by letter of April 12, 1984, as set forth in the margin.[3] The Control Office's letter

---

1. The effect of this designation was to block all of Airways' assets and prohibit any transactions in property without a license from the Control Office.

2. These allegations, made in the O'Connell affidavit, are not refuted by the appellants.

3. In response to your application of March 30, 1984 on behalf of American Airways Charters, Inc. ("AAC"), pursuant to the March 29, 1984 Order of the United States Court of Appeals for the District of Columbia Circuit, the following action is taken:

    1. You are hereby authorized to represent AAC as counsel until April 12, 1985, effective ten days following the receipt by this Office of satisfactory evidence and information in accordance with the conditions set forth in paragraphs two and three. This Office will conduct a review of the information and notify you prior to the expiration of the ten-day period whether the conditions have been satisfied.

    2. You are required to present to this Office satisfactory evidence, including appropriate documentation, that a person currently authorized to act for AAC has retained your services on behalf of the corporation.

    3. You are required to present to this Office the following information:

was in the form of a "conditional license," which conditioned Mayerson's employment on his furnishing additional information to the Control Office. Most of the additional information—including information regarding Mayerson's extensive contacts with other Cuban entities—has *not* been produced. Airways was subject to control under the Trading With the Enemy Act when it is claimed Mayerson was designated, and because he was hired by Fuentes (under whose presidency Airways was allowed to become a Cuban national) and because he seeks approval for his *continuing* employment as counsel, *for no disclosed purpose,*[4] under a contract which he contends authorizes him to bill Airways $100 an hour for his services, the Control Office has continued in its refusal to license Mayerson, except on a *conditional* basis as heretofore noted. The inquiry by the Control Office to determine that Mayerson was properly authorized to represent the Corporation, that he was not actually intending to represent Fuentes, and that he had no conflict of interest that would disqualify him from representing Airways were all proper pre-license inquiries. So was the attempt to determine if Fuentes was trying to extend his authority and act as president of Airways *after* his disqualification.

> a. Have you ever represented any person or persons identified in your response to paragraph two above in any matter or have you been retained by such a person? If so, please identify the time period and explain the nature of the representation in detail.
> b. Whose instructions do you intend to follow with regard to your representation involving AAC matters?
> c. What are the scope and nature of your anticipated activities for or on behalf of AAC as legal counsel to AAC?
> d. What is the anticipated cost of your services and what is the anticipated source of funds for payment of fees?
> e. What relationship do you have now and have you had with Marazul Tours, Inc., a New York travel agency and air carrier providing Cuban travel services to Cuba?
> f. What contact or dealing, if any, do you have, or have you had, with Havanatur, a Cuban controlled firm that is AAC's largest debtor and creditor, since January 1, 1982? Please explain in detail.
> g. Please explain why it would not be a *conflict of interest* for you to represent AAC in

## II.

This case is simply not in the proper posture to permit resolution of the complex issues it contains. The district court ruled on the situation as it found it; the situation has now changed, and the case should be remanded for further proceedings.

At the time the district court rendered its decision in this case, Mayerson had not applied for a license to represent Airways. On appeal, it was clear that Mayerson had not exhausted his administrative remedies before bringing suit. The situation of this case was so muddled at oral argument that this court, to try to clear up some of the confusion, took the unusual step of ordering Mayerson to apply for a license. He did so. The Control Office responded by issuing a "conditional license" which demanded certain information and stated that the license would become effective only when someone *currently* authorized to act for Airways requested Mayerson's services. This "conditional license" marks the first time in this litigation that the agency has *done* anything beyond stating that it did not consider Mayerson to be Airways' lawyer. Thus, there is now—*for the first time in this case*—some concrete agency action for the trial court to review.

> light of the fact that you now represent or have very recently represented Marazul, which is dependent on concessions from Cuba for its significant Cuban travel business, and the Cuban entity Havanatur is AAC's principal debtor and creditor.
> 4. You are hereby advised that this license authorizes only the representation described in paragraph one and does not authorize any further actions or transactions involving AAC or its assets, including debits to any AAC funds. Any such further transactions would require separate specific licensing action by this Office.
> 5. Unless extended, this license expires 30 days from the date of issuance thereof if the conditions set forth herein have not been satisfied by that date.
> (Emphasis added.)

---

4. There is no indication in the record, which the concurrence seems to overlook (Conc.Op. p. 876), that Mayerson is seeking to bring a belated action to contest its designation as a "Cuban national."

Moreover, it is entirely possible that there is still no case or controversy because ·when it was instituted *the suit brought by Mayerson had not been properly authorized by responsible officers or directors of Airways.* This lack of specific authority to institute the lawsuit when it was filed distinguishes this case from *Dean Witter Reynolds, Inc. v. Fernandez,* 741 F.2d 355 (11th Cir.1984). The majority's approach to this problem is to assert the bald conclusion that "facts not in dispute" demonstrate that the suit was properly authorized. *See* Maj. at n. 5. But on this record it is impossible to determine that Mayerson had adequate corporate authorization to bring *this suit.* The continuance of Mayerson's authority to act as a lawyer for Airways and to institute this specific suit at the time he did are, under the Trading With the Enemy Act, valid subjects for inquiry by the Control Office. The Control Office in making the inquiries posed by its conditions is exercising a specific duty imposed upon it by Congress and is not to be considered as a stranger to the situation.

Fuentes claims in an affidavit that, prior to his disqualification, he directed Mayerson "to take any and all actions necessary to represent [Airways'] rights and interests with respect to [the Control Office] *or any other legal matter*" (J.A. 32) (emphasis added). The delegation of such broad corporate authority is clearly *ultra vires* even a legal corporate president. A secret shareholders' meeting of Fuentes and Dooley in the Bahamas, that may or may not have been legal, apparently attempted to "ratify" Fuentes' action.[5] Neither this shareholders' meeting, nor a subsequent directors' meeting, purported specifically to authorize the initiation of any lawsuit. The present suit was *not* specifically "ratified"

by the shareholders. One issue is whether or not Fuentes' very broad statement, made long before this lawsuit was filed, and long before the subsequent attempted "ratification" of that statement, authorized the attorney to bring this specific lawsuit.

The majority relies for its position on this point on a section of a general treatise, which does not support its position. The treatise states:

The general rule that an attorney, who is clothed with no other authority than that arising from his employment in that capacity, has no power to compromise or settle or release and discharge his client's claim, applies equally to attorneys for corporations .... The general counsel of a corporation, in the absence of provision in the charter or bylaws, *has no authority to institute and prosecute suits without the sanction of the directors or other proper officer....* But such an attorney may do all things *incidental* to the prosecution of the suit but which affect the remedy only and not the cause of action.

9 W. Fletcher, Cyclopedia of the Law of Private Corporations § 483 (rev. perm. ed. 1982) (emphasis added). The work goes on to state specifically that "[a]s a general rule the control of the conduct of litigation is the responsibility of the *directors.*" 2 W. Fletcher, *supra,* § 4119 (rev.perm.ed. 1976) (emphasis added). Those provisions specifically apply to corporate general counsels; for outside retained attorneys like Mayerson, the rule is as follows:

They cannot themselves bring suits for the corporation, unless *specially authorized,* nor can they compromise or release a corporate claim; but they may do all things incidental to the prosecution of

---

**5.** A substantial question exists whether the shareholders' meeting in the Bahamas comported with Florida law. Florida requires that a "majority" of the outstanding shares constitutes a quorum for conducting business, unless otherwise provided in the bylaws. Fla.Stat. § 607.-094. There is no evidence in the record as to how much of Airways stock each co-owner had. The May 27, 1983, meeting was conducted nine months after Fuentes was barred from acting

for the corporation by the Control Office on September 17, 1982. The question is whether Fuentes, who had been disqualified from acting for Airways, could nevertheless thereafter exert control through a shareholders' meeting. If not, it is entirely possible that there was not a valid quorum present at the secret meeting. Such a fact-based question is obviously one that is initially for the trial court.

the suit, and which affect the remedy only and not the cause of action.

*Id.* § 4220. Thus, even relying on the source cited by the majority, a lawyer cannot bring a lawsuit on behalf of a corporation unless, at the very least, he has been "specially authorized" to bring that particular suit. There is no "special" authorization for this suit in the present record, nor is any such authorization claimed. The district court has not passed upon whether Fuentes' claim of direction to "take any and all actions necessary to represent" Airways on "any legal matter" is adequate *special authorization* to bring this particular suit. On the contrary, it appears to be an attempt to delegate an overly wide discretion to institute law suits that is specifically vested by statute in the directors. This court on appeal cannot properly decide such a fact-based issue on the present record.

Moreover, the majority's reliance on an ambiguous paragraph from a general treatise for such an important point is curious. Clearly, the question of whether an agent has authority to bring a lawsuit is a matter of state law. In this case, as the majority frequently stresses, it is *Florida* law. Although the majority repeatedly chastises the Control Office—unjustly—for allegedly failing to determine Florida law,[6] it does not attempt to determine Florida law on this issue.[7] Either Florida law governs the

6. The majority repeatedly implies that the Control Office somehow failed to follow Florida law when it decided that Airways' *vice president* was the proper person to deal with when its *president* was incapacitated. There is nothing in the record to indicate that the Control Office erred in recognizing Vice President Masdeu as the legal spokesman for Airways. The majority itself, since it has not consulted Florida law, is not in a position to determine whether Masdeu is or is not the proper individual, yet it is willing to criticize implicitly the Office's actions.

Actually, Florida law provides that "[a]ll corporate powers shall be exercised by or under the authority of ... a board of directors," although the articles of incorporation (which do not appear in this record) may provide otherwise. Fla.Stat. § 607.111(1). Thus, this court does not know whether the directors or the officers have the power to exercise "all corporate powers." The only *required* officers of a corporation in Florida are (1) the president, (2) the secretary, and (3) the treasurer. *Id.* § 607.-151(1). And the law provides that:

All officers and agents, as between themselves and the corporation, shall have such authority and perform such duties in the management of the corporation as may be provided in the *bylaws* or as may be determined by resolution of the board of directors not inconsistent with the bylaws.

*Id.* § 607.151(2) (emphasis added). It thus is clear that the question of who can act for Airways is not determined wholly by the Florida statute. What is required, as is usual under corporate law, is an examination of Airways' bylaws and its corporate resolutions. As these bylaws are not conclusive and the other corporate records are not in the record, the majority is in no position to criticize the Control Office's decision.

Similarly, the majority dismisses the Control Office's argument that Mayerson's authority lapsed when Fuentes was barred from acting by stating that the Office "misperceives agency law." Maj. at 874 n. 17. Despite its insistance on the applicability of Florida law, the majority cites solely to the Restatement (Second) of Agency, as if there was some overriding federal common law of agency. The Restatement rule may or may not coincide with that adopted by the courts of Florida, but Florida law must be examined before summarily dismissing an argument.

7. The majority does cite a Florida decision, *Conlee Construction Co. v. Cay Construction Co.*, 221 So.2d 792 (Fla.Dist.Ct.App.1969), for the uncontroversial principle that "the president of a corporation has authority to engage the services of counsel on the corporation's behalf." Maj. at n. 5. But the question is *not* whether Fuentes could hire Mayerson to advise the corporation, but whether Fuentes himself could authorize the bringing of a particular suit, and whether Fuentes' very general statement amounted to such authorization. In *Conlee*, the board of directors deadlocked over whether to give special authorization for a suit; the president, who was a stockholder and authorized in that capacity to sue on behalf of the corporation, instituted suit to benefit the corporation. The court recognized that the Florida statute provides that "[t]he business of every corporation shall be managed and its corporate powers exercised by a board of not less than three directors," *see* Fla.Stat. § 609.09, but noted that if directors are hopelessly deadlocked, "the president as chief executive officer of a going concern may even in the face of a deadlock take steps to protect corporate interests where immediate and vital injury threatens." 221 So.2d at 796. Under those circumstances, the court held that the suit was authorized. The case asserts that "in the absence of internal conflict, the president ..." may hire attorneys and institute suits. 221

internal workings of this corporation, or it does not. It cannot be followed on some issues and ignored on others.

The district court has not had the opportunity to determine Florida law on this point, or to evaluate the initial validity or subsequent continuance of the Fuentes-Mayerson relationship in light of that law. It is impossible on the present record to determine if this suit was properly authorized. That task is properly one for the *trial* court.

Despite their harsh condemnation of the Government, their claim to lofty principles of justice, and their high-sounding language, the majority and concurring opinions have merely gone a long way toward making this difficult case even more complicated. If the district court "stumbled" over the pitfalls of this case, *see* Maj. at 869, the majority, by contrast, has executed a half gainer onto the pavement. In its apparent eagerness to impugn the ethics and integrity of the Office of Foreign Assets Control, the majority has evaded all the jurisdictional problems and simply declared its own rule of law. Because the district court should pass on these questions in the first instance—especially in a case such as this where the factual record is in a highly unsatisfactory state for meaningful appellate review—I would remand to the district court to allow it to review the conditional license upon an adequate evidentiary record.[8]

### III.

If it were necessary or proper to reach the merits of this case, as the majority has, I would have very serious doubts as to the majority's purported resolution of the issues. Most of those doubts revolve around the majority's attempt to either (1) ignore

the fact that this case involves an *employment contract,* or (2) draw some kind of line between employment contracts for lawyers and those for accountants, consultants, and mechanics. Without attempting to decide the issues or provide detailed analysis, the following are my areas of disagreement with the majority and the concurring opinions.

### A.

It is a basic principle that authority over the foreign affairs of the United States is constitutionally vested in the Executive Branch of our Government, subject to some legislation that must pass constitutional muster. The Judiciary necessarily has a limited role to play. As the Supreme Court recently noted, "Matters relating 'to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Regan v. Wald,* —— U.S. —— at ——, 104 S.Ct. 3026, 3039, 82 L.Ed.2d 171 (1984) (quoting *Harisiades v. Shaughnessy,* 342 U.S. 580, 589, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952)).

The authority delegated by Congress to the President under the Trading With the Enemy Act is considerable. "[B]oth the legislative history and cases interpreting the [Act] fully sustain the broad authority of the Executive when acting under this Congressional grant of power." *Dames & Moore v. Regan,* 453 U.S. 654, 672, 101 S.Ct. 2972, 2983, 69 L.Ed.2d 918 (1981). The Supreme Court only recently refused to hold that the power originally granted to the President in the Act—and grandfathered as to Cuba under 1977 amendments to the Act—is to be narrowly construed. *See Regan v. Wald, supra.*

So.2d at 795. But, internal conflict did exist here and the sanctions imposed by law as a result of the determination by the Control Office also satisfy that standard. *Conlee* did not purport to decide whether in the absence of explicit authorization from the board of directors, an earlier general designation by a corporate officer of a lawyer for no specific corporate purpose permits the lawyer on his own authority to

institute lawsuits in the name of the corporation.

8. The majority states that the case is to be remanded for "appropriate" relief, but nowhere indicates what that relief might be. The district judge who must attempt to implement the court's decision has a difficult task.

Examining the statute in light of the President's broad authority, it seems apparent that employment contracts of lawyers for countries or entities covered by the Trading With the Enemy Act would fall within the range of transactions for which the Control Office may require licenses. Section 5(b) of the Act provides that the Control Office, through "such rules and regulations as [it] may prescribe, by means of instructions, licenses, or otherwise," has the authority to

> investigate, *regulate,* direct and compel, *nullify, void, prevent or prohibit,* any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or *exercising any right, power or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person ....*

50 U.S.C.App. § 5(b)(1)(B); 91 Stat. 1625 (emphasis added). Pursuant to this delegation of power, the Secretary of the Treasury promulgated Cuban Assets Control Regulation C.F.R. § 515.201(b),[9] which provides:

> (b) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury ... by means of regulations, rulings, instructions, licenses, or otherwise ...:
>
> (1) All dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property ....

The regulations specifically apply to "transfers of property" which is specifically defined in the Regulations as follows:

> any actual or purported ... *transaction* ... the purpose, intent, or effect of which is to create ... any right, ... power, ... or interest with respect to any property and ... *shall include the making of any power of attorney, ... contract, the appointment of any agent,* or the exercise of any power of appointment ... or other power.

3 C.F.R. § 515.310 (emphasis added). It thus appears that hiring a lawyer at $100 an hour "to take any and all actions necessary to represent [Airways'] rights and interests with respect to [the Control Office] or any other legal matter" (J.A. 32) constitutes "making a power of attorney," "making a contract," or "appointing an agent," and hence is a "transaction" subject to licensing by the Control Office. This authority brings attorney's contracts within the jurisdiction of the Trading With the Enemy Act in a manner similar to the way 11 U.S.C. § 327(a) of the Bankruptcy Act brings the employment of attorneys within its jurisdiction:

> § 327. Employment of professional persons
>
> (a) Except as otherwise provided in this section, the trustee, *with the court's approval,* may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

(Emphasis added.) Under both Acts it is legitimate for the agency charged with carrying out the terms of the Act to inquire whether an attorney purporting to act for a subject corporation does "hold or represent an adverse interest to the estate [or corporation] ..." *Id.*

The majority cites some legislative history that it admits is "less than crystalline," but ignores one other indication of Congress' intent. Forty-one years ago, the court in *Alexewicz v. General Aniline & Film Corp.,* 181 Misc. 181, 43 N.Y.S.2d 713 (Sup.Ct.1943), relying on essentially identical language, held:

> [T]he Secretary of the Treasury, acting through his designated Treasury representative, had ample authority to condition the defendant's continuance in business upon a severance of relationships with those individuals whom the Govern-

9. *See* 50 U.S.C.App. § 5 for Extension of National Emergency Powers, Cuban Assets Control
Regulations, 31 C.F.R. Part 515, and history of extensions from 1978 to 1984.

ment believed to be improper employees. Having the power to regulate or prohibit in toto the financial operations of the defendant, it had the implied authority to condition the continuance of the license to do business upon its approval of the employment practices of the corporation. *Id.* at 724. The relevant provisions interpreted in the *Alexewicz* decision have continued substantially unchanged by Congress for these many years. This continuing Congressional acquiescence indicates that Congress did not consider such employment contracts to be beyond the reach of the Treasury.[10]

Indeed, the majority ultimately decides not to decide whether employment contracts as a class cannot be affected by the Control Office. But it seems clear that the majority would not have reached the same decision had the Office merely required a license for the hiring of an outside auditor. It is apparently the hiring of an *attorney* that makes the equation different. The majority tries to distinguish between the "bare formation of an attorney-client relationship," Maj. at 871, and the actual retention of counsel, which obviously implies payment.

### B.

That an attorney—rather than a pipefitter—is involved in this case does not necessarily alter the legal situation. The majority justifies its narrow restriction of the Control Office's authority as necessary to avoid possible constitutional infirmities, *i.e.*, infringement of the right to counsel. But this case does *not* involve a right to counsel under the Sixth Amendment (it is

not a criminal case) or a right under the due process clause. *The question is not whether the corporation had a right to appoint Mayerson as counsel, but whether the corporation properly authorized him to bring the suit.*

I note, however, that the majority attempts to protect the right to counsel by drawing a theoretical line between issuing a license to a lawyer permitting him to enter into an employment contract, and issuing a license permitting him to be paid for performing under that contract. The majority apparently recognizes that the Control Office is free to refuse to allow Airways to *pay* Mayerson, but holds that it cannot forbid entry into the contractual relationship itself. In other words, the Office can bar *performance* of contracts for legal services, but not *creation* of such contracts. That is a *very* fine distinction, and hardly a practical one. It seems elementary that if one has a *right* to a lawyer it must include a right to pay the lawyer.[11] An employment contract is generally considered to include both services *and* reasonable compensation.

Mayerson claims to have been hired as Airways' lawyer. He thus contends he has a contractual relationship with the corporation. He is *not* representing it on a *pro bono* basis; he fully intends to be paid his $100 an hour fee for whatever services he renders, and he intends to be paid out of the corporate assets that the Government is trying to preserve for Airways' creditors. To assert that the Control Office cannot forbid the *creation* of a contract to provide legal services at $100 an hour, but can forbid its *performance*, would exalt form over substance. On this point, the concur-

---

**10.** The majority attempts to downplay, by using bits of legislative history, the effects of the changes made in the Act in 1941. In fact, Congress granted to the President the power to define the terms used in the Act on December 18, 1941—11 days after Pearl Harbor. It is difficult to believe that Congress, with the nation at war on two continents, intended a *narrow* power to carry out the country's war aims. As the *Alexewicz* court recognized, Congress intended the 1941 amendments to the Act to "confer upon the President or his representative the *broadest possible authority* over the property of

foreign nationals, in order to forestall the possibility that such property might be utilized for purposes hostile to the common defense." 43 N.Y.S.2d at 720 (emphasis added). So long as such powers do not offend the Constitution, the courts are obligated to give them full scope.

**11.** Would the Court in *Goldberg v. Kelly*, 397 U.S. 254 (1970), for example, have upheld a regulation that permitted a welfare recipient to *hire* an attorney, but prohibited him from *paying* one?

ring opinion concurs with this opinion that Mayerson cannot be paid by the corporation unless authorized by the Control Office.

### C.

Part III of the majority's opinion attempts to buttress its case by the use of a straw man: the majority characterizes the Control Office's position as authorizing it to "tak[e] the corporation over from the inside." The Government has never made such an argument. It simply claims the authority to regulate Airways' *external* relationships, including entry into a contract for legal services not properly authorized by the corporation or the Control Office.

> The majority begins by asserting that [the Control Office] has no authority to seize the corporation itself, to vest its assets, or—beyond the power it has over employment contracts entered into by [Airways]—to rearrange its internal affairs.

Maj. at 874. The Office, however, has made no attempt to "seize the corporation," or "vest its assets," or "rearrange its internal affairs." It has done only two things: (1) prohibit the president from acting for the corporation (which the majority acknowledges that it may do), and (2) prohibit the creation of an employment contract without a license from the Control Office.

> The majority goes on to state:
>
> But [the Control Office] may not, to give an extreme example, take a member of its own staff and, without regard to [Airways'] corporate structure, install that person as [Airways'] new chief executive officer, thereby controlling [Airways'] operations from the inside.

Maj. at 875. The Control Office has not, of course, done this. Should it attempt improperly to do this at some time in the future, it can properly be reprimanded. Since it has not, the majority is just building straw men.

Finally, the majority suggests that the Control Office has failed to show "how taking the corporation over from the inside ... furthers the balancing of interests embodied in the congressional external control scheme." Maj. at 875. The Office's failure to make that showing may be due to the fact that it has never attempted to take over the corporation.

All of this miscast argument leads up to part IV of the opinion, in which the Control Office's understandable reluctance to license the creation of an open contract obligating Airways to pay $100 an hour in legal fees is somehow found to be unworthy of the officers of our great Government. On the contrary, what evidence appears in this generally inadequate record supports an inference that the Control Office has acted in an intelligent, competent manner, and apparently within the scope of statutory and constitutional authority.

### IV.

In sum, the majority's attempt to draw a line between *creation* and *performance* of contracts is unconvincing; its misapplication of the right to counsel concept overlooks the fact that the real question is whether counsel under the corporate articles and bylaws and the laws of Florida was properly authorized to bring this lawsuit; and its refusal to recognize the broad foreign affairs authority of the Executive when acting pursuant to additional authority from the Congress usurps the constitutional power vested in the President and the Congress.

Most importantly, however, it is entirely possible that there is no case or controversy, and the district court should be permitted to address that issue on remand. For that reason, I agree with the remand to the district court. As to the legal issues purportedly resolved in the majority and concurring opinions,[12] I must respectfully dissent.

---

12. The record here, as yet, does not prove that the authorized officers of the corporation properly exercised the "right to choose and obtain counsel" or properly authorized this lawsuit which so far as appears is a request for authority to bring any lawsuit that the lawyer decided

to bring—without prior approval of the corpora-
tion. The entire analysis of the concurring
opinion is misguided, misstates the actual facts
and indulges in extreme exaggeration. It is true
that any person charged with a crime has a
right to counsel, in fact every litigant has a right
to counsel; but the continuing authority of

counsel appointed by an ousted corporate offi-
cer is open to serious question, especially where
the directors did not approve the appointment
or the instigation of specific litigation, and the
corporation has come under the licensing juris-
diction of the Control Office administering the
Trading With the Enemy Act.